452 F.2d 350
 UNITED STATES of America ex rel. Charles TOWNSEND, by
William R. Ming, Jr., his next friend, Petitioner (Appellee),
v.
John J. TWOMEY, Warden of Illinois Penitentiary,
Joliet-Statesville Branch, Respondent (Appellant).
 No. 71-1074.
 United States Court of Appeals,
Seventh Circuit.
 Nov. 19, 1971.
As Amended Jan. 21, 1972.
 
 William J. Scott, Atty. Gen., Donald J. Veverka, Asst. Atty. Gen., James B. Zagel, Morton E. Friedman, David E. Bradshaw, Asst. Attys. Gen., Chicago, Ill., for respondent-appellant.
 William R. Ming, Jr., Sophia H. Hall, Aldus S. Mitchell, Jr., Andrew M. Raucci, Chicago, Ill., for petitioner-appellee.
 Before CUMMINGS, KERNER and PELL, Circuit Judges.
 PELL, Circuit Judge.
 
 
 1
 This litigation, now assuming Jarndycian proportions, is once again before this court. The origin of the court procedures occurred on April 7, 1955, in the Criminal Court of Cook County, Illinois, when Charles Townsend was found guilty of murdering one Jack Boone, Sr., on December 18, 1953, and was sentenced to death.
 
 
 2
 The itinerary of the subsequent court proceedings has been elevator-like between the Cook County Court and the United States Supreme Court with intermediate stops at the Illinois Supreme Court, United States District Court and this court.
 
 
 3
 To avoid this opinion assuming the epic dimensions of the litigation engendering it, rather than detailing, except when necessary to the opinion, the history of the litigation, the net effect of which has been to give Townsend the dubious distinction of national seniority on death row, collateral reference, contained in Appendix A to this opinion, will make available the course of the court deliberations.
 
 
 4
 At the outset we are not unmindful of but reject the possibility of a human reactive assumption that extended and extensive court proceedings such as here involved must have provided a thorough ventilation of all ailments to which this conviction might be subject. Although not entirely optimistic that this opinion will mark the end of the trail, we have devoted close attention to the voluminous record now before us.
 
 
 5
 Also at the outset, we are unaware of any proper basis for the criticism leveled by Townsend toward the State as resisting in the extensive litigation here involved, Townsend's efforts to set aside his conviction. The State should, of course, prosecute only the guilty but when guilt has been determined, the prosecutorial duty would seem to be on the side of supporting such determination in the absence of a clear basis for setting it aside. The matter was demonstrably arguable here.
 
 
 6
 Further we note with commendation the vigorous and valiant efforts of Townsend's counsel on his behalf, efforts rendered without expectation of compensation reasonably commensurate with the amount of work implicit in the through-going representation here involved. We also note the ironically singular lack of appreciation by the client involved for that which was performed in his behalf.
 
 
 7
 The immediate reason for the case now being here is the culmination of the second federal habeas corpus proceedings in the district court by a judgment order issuing the writ. The district court order, 322 F.Supp. 158, voided a jury verdict and Townsend's death sentence and he was to be held for a new trial no later than four months from the date of the order. In the interim, Townsend was to be admitted to bail on his own recognizance without surety while awaiting trial. This court granted a stay of the order pending appeal by the respondent.
 
 
 8
 Although Townsend's counsel has developed numerous issue facets, the matter before us is basically two-pronged: a post-Witherspoon[1] consideration of the death penalty and the voluntariness of Townsend's confession which was admitted into evidence and which was a critical factor in his conviction. Following the first habeas corpus evidentiary hearing in the district court, that court held that the confession was voluntary and was not drug induced as Townsend alleges. The court nevertheless granted the writ on this first occasion on the basis that there was new evidence which should be submitted to a jury. This court reversed the latter ruling. United States ex rel. Townsend v. Ogilvie, 334 F.2d 837 (7th Cir. 1964), cert. denied, 379 U.S. 984, 85 S.Ct. 683, 13 L.Ed.2d 574 (1965).
 
 
 9
 While there is no indication in the present case of such a situation, it appears to the writer of this opinion that sometimes courts lean toward belief in the words of one who stands as a convicted criminal rather than the words of law enforcement officers. This is indeed an anomalous situation disregarding entirely as it does the fact that the pressure to recall events favorably would seem infinitely greater on the person who might thereby have his personal liberty restored than upon one who had no personal gain at stake. Thus, in Townsend's testimony it is noted that he testified as to symptoms which correspond to the objective manifestations which occur when the drug in question is given in a sufficient dosage. Every person present except Townsend testified that none of these objective manifestations were present. The witnesses included not only the police officers but also the court reporter and the Assistant State's Attorney. The latter testified that Townsend gave no outward manifestation that he was suffering from poor vision or trouble in hearing and that he seemed alert and coherent. While the question of credibility is the province of the trial, not reviewing, court, nevertheless it is not unknown for prisoners to read and reread transcripts and to have the opportunity to cogitate at length on what testimony would be most favorable to their causes.
 
 
 10
 In any event, Townsend testified at the first evidentiary hearing, and the district court then considering that testimony as well as the medical testimony found that the confession was voluntary.
 
 
 11
 Following the second evidentiary hearing, the district court again granted the writ and found, contrary to its conclusion on the previous petition, that the confession was drug induced and involuntary. The district court further concluded that even if the confession were not drug induced it was involuntary under the totality of the circumstances. We have some concern that the totality doctrine itself may be subject to occasional judicial abuse as a device to clothe a reversal where the fragmented issues separately are inadequate for that purpose and collectively only provide an intuitive surmise that the proceedings below were not quite fair. We do not, however, because of the opinion we reach, need to decide that question here.
 
 
 12
 Initially, the respondent asserts that it was an abuse of the district court's discretion to consider again the issue of the voluntariness of Townsend's confession and now to hold such confession involuntary and drug induced. As previously indicated, following Townsend's original federal evidentiary hearing, the district court specifically ruled that his confession was not drug induced and that it was voluntary. Townsend took no appeal from those findings and conclusions. However, this court gave attention to them in the course of the State's appeal on other grounds. In an opinion evidencing a thorough study of the record, Judge Swygert found that the record supported the conclusion of the district court that the confession was voluntary and not drug induced. United States ex rel. Townsend v. Ogilvie, supra, 334 F.2d at 842.
 
 
 13
 Further, many of the facts and matters set forth by the district court in the present memorandum opinion were the same as contained in the previous findings of fact as to which Judge Swygert commented:
 
 
 14
 "Were we, however, to consider the merits of these grounds, we are of the opinion that none of them, upon analysis, would constitute a sound basis for the granting of a new trial." Id. at 843.
 
 
 15
 It appears rather clear that the district court having determined in 1964 that Townsend was entitled to a new state trial has now, seven years later, taken another tack at arriving at the same result based upon factors which, as will be developed hereinafter, were inadequate as a foundation for the exercise of discretion. 28 U.S.C. Sec. 2244(b) undoubtedly provides for a second and successive habeas corpus application but discretionary authority must be exercised soundly, and not in an unbridled fashion for the purpose of achieving a result which this court has previously held the district court could not reach.
 
 
 16
 As Judge Swygert stated in conclusion in United States ex rel. Townsend v. Ogilvie, supra, 334 F.2d at 843:
 
 
 17
 "Finally, we conclude a federal court has exhausted its statutory power in a habeas corpus proceeding after it has decided a confession, introduced in a state criminal trial, was voluntarily given. The court does not possess a residuum of power to search the record for procedural errors not involving constitutional rights and issue a writ of habeas corpus for the purpose of providing a new trial in the state court.
 
 
 18
 "A federal court acting in this fashion would constitute a super appellate tribunal and encroach upon state appellate court prerogatives; such action would affront the principles of federalism upon which our federal-state juridic system operates."
 
 
 19
 An analogous situation presented itself to the Second Circuit in United States ex rel. Schnitzler v. Follette, 406 F.2d 319 (2d Cir.), cert. denied, 395 U.S. 926, 89 S.Ct. 1783, 23 L.Ed.2d 244 (1969). There the district court granted the writ and was reversed by the court of appeals. The petitioner then returned to the district court where a second district judge again issued the writ on the same ground previously rejected by the court of appeals. On appeal from that decision, the Second Circuit noted that 28 U.S.C. Sec. 2244(b) does give the district court discretion to entertain successive identical applications for a writ of habeas corpus but noted that "it hardly encourages such action" and that such discretion was subject to abuse. Schnitzler, supra, 406 F.2d at 321.
 
 
 20
 The court then reviewed the principles governing the exercise of such discretion as set out in Sanders v. United States, 373 U.S. 1, 15, 83 S.Ct. 1068, 10 L.Ed.2d 148 (1963), and concluded that the same ground had been determined on the merits adversely to Schnitzler on the prior application, and he had not carried his burden of showing that the ends of justice would be served, i. e., by showing that relevant facts had not been fully developed on the first application or that there had been an intervening change in the law. Accordingly, it held the district court not only could have refused to entertain the second application but was required not to entertain it.
 
 
 21
 "While res judicata does not apply to successive habeas applications Judge Croake was bound to follow our prior decision, rendered upon a factual and legal background identical to that before the district court, under the common principle of stare decisis. In this case, as in all others, the district court is required to follow a binding precedent of a superior court, and it abused its discretion in declining to do so." Schnitzler, supra, 406 F.2d at 322.
 
 
 22
 As did Chief Judge Lumbard in Schnitzler, we find support for our position in Sanders v. United States, supra. There the court had before it the analogous problem of successive motions under 28 U.S.C. Sec. 2255.
 
 
 23
 Mr. Justice Brennan in part dealt with the matter as follows:
 
 
 24
 "A prisoner whose motion under Sec. 2255 is denied will often file another, sometimes many successive motions. We are aware that in consequence the question whether to grant a hearing on a successive motion can be troublesome-particularly when the motion is prepared without the assistance of counsel [not the situation in the Townsend case] and contains matter extraneous to the prisoner's case. But the problem is not new, and our decisions under habeas corpus have identified situations where denial without hearing is proper even though a second or successive application states a claim for relief. One such situation is that involved in Salinger v. Loisel, supra [265 U.S. 224, 44 S.Ct. 519, 68 L.Ed. 989]. There, a first application for habeas corpus had been denied, after hearing, by one District Court, and the denial was affirmed by the Court of Appeals. The prisoner then filed subsequent applications, all identical to the first, in a different District Court. We indicated that the subsequent applications might properly have been denied simply on the basis that the first denial had followed a full hearing on the merits. We there announced a governing principle; while reaffirming the inapplicability of res judicata to habeas, we said: 'each application is to be disposed of in the exercise of a sound judicial discretion guided and controlled by a consideration of whatever has a rational bearing on the propriety of the discharge sought. Among the matters which may be considered, and even given controlling weight, are * * * a prior refusal to discharge on a like application.' 265 U.S., at 231 [44 S.Ct. 519, at 521, 68 L.Ed. 989]. The Court quoted approvingly from Mr. Justice Field's opinion in Ex parte Cuddy, supra, [C.C., 40 F. 62] at 66: "'The action of the court or justice on the second application will naturally be affected to some degree by the character of the court or officer to whom the first application was made, and the fullness of the consideration given to it."' 265 U.S., at 231-232 [44 S.Ct. 519, at 522, 68 L.Ed. 989]. The petitioner's successive applications were properly denied because he sought to retry a claim previously fully considered and decided against him." (Emphasis supplied.) Sanders v. United States, supra, 373 U.S. at 8-9, 83 S.Ct. at 1073.[2]
 
 
 25
 Townsend argues that his case is distinguishable from Schnitzler because the facts before the district court on his second application were not identical to those considered by this court upon review of the first application. Having studied the record, we cannot agree. However, before directing our attention to an analysis of the claimed differences between the first and second evidentiary hearing, we must first determine whether there is a necessity in the law applicable in this particular case for the existence of different or "new" evidence. Our reading of Sanders v. United States, supra, convinces us of the necessity of some differential basis before a district court may in the exercise of sound discretion properly consider the successive habeas corpus petition. We are not here concerned with the situation where the first application was prepared without the existence of counsel.
 
 
 26
 The ground rules are stated by Mr. Justice Brennan in Sanders at page 15, 83 S.Ct. at 1077:
 
 
 27
 "Controlling weight may be given to denial of a prior application for federal habeas corpus or Sec. 2255 relief only if (1) the same ground presented in the subsequent application was determined adversely to the applicant on the prior application, (2) the prior determination was on the merits, and (3) the ends of justice would not be served by reaching the merits of the subsequent application." (Emphasis supplied and footnote omitted.)
 
 
 28
 On final analysis, Townsend's claim for a second hearing must rest upon the third factor that the ends of justice would be served by reaching the merits of his application. The burden in such event is upon the applicant, Sanders, supra, 373 U.S. at 17, 83 S.Ct. 1068. The Court there pointed out that while "the ends of justice" cannot be too finely particularized, two principal bases would be: (a) if factual issues are involved, the evidentiary hearing on the prior application was not full and fair and (b) if legal questions are involved there has been an intervening change in the law or there is some other justification for having failed to raise a crucial point or argument in the application.
 
 
 29
 Our analysis of the record does not indicate either that the first hearing was not full and fair or that there has been any intervening change in the law or other justification for having failed to raise a crucial point or argument in the prior application. Nevertheless, the district court in its memorandum opinion makes the following flat statement:
 
 
 30
 "New and additional evidence has been adduced at this hearing; new exhibits introduced and new testimony given. Since the earlier evidentiary hearing before this court, there have been advances and changes in the law protecting petitioner's rights."
 
 
 31
 It seems apparent that the district court in granting the writ deemed that it was crucial to the proper exercise of discretion to bring the present case within at least one prong of the "ends of justice" standard of Sanders, and we have examined the district court's decision accordingly. In our opinion, it fails to demonstrate any aspects of "newness," either legally or factually, to meet the third requirement for denying controlling weight to a rejection of a prior application for habeas corpus.
 
 
 32
 Insofar as the change of law which the district court purported to find, the only case cited in its opinion, which was decided subsequent to the district court's 1964 evidentiary hearing, was Smith v. Yeager, 393 U.S. 122, 89 S.Ct. 277, 21 L.Ed.2d 246 (1968). Smith involved a factual situation where there had been a change in the law but Smith itself does not change the law previously analyzed in Sanders and Salinger. Further, we are unaware of any change in the law subsequent to the 1964 decision which would be of benefit to Townsend.
 
 
 33
 With regard to the factual situation, nothing brought out in the second evidentiary hearing persuades us that the hearing on the first application was not full and fair.
 
 
 34
 The allegedly new evidence presented on the confession issue at the second evidentiary hearing was the testimony of an expert witness, Dr. Lawrence Freedman. Dr. Freedman's testimony covers approximately 250 pages of the record. However, the essential thrust of it, as found by the district court, deals "with the susceptibility of Townsend to the drug [administered prior to his confession] and his suggestibility thereunder. * * * He [Dr. Freedman] stressed the importance of the co-existing factors at the time [the drug] is given. * * * Dr. Freedman found Townsend was at the time of his confession given [the drug] hyoscine under various co-existing factors which made him suggestible."
 
 
 35
 The apparent purpose of this testimony was to overcome a difficulty faced by the defense since the inception of this case. While there is no dispute that Townsend was given an injection of hyoscine and phenobarbital prior to making his confession, the State had offered expert evidence that the dose was much too small to induce a confession and was administered solely to relieve Townsend's withdrawal symptoms.
 
 
 36
 Dr. Freedman expressly stated that he was not expressing an opinion as to whether Townsend's confession was in fact drug induced. The essence of his testimony was that there were certain coexisting factors which would affect the susceptibility of Townsend to drugs and his suggestibility thereunder.
 
 
 37
 Townsend contends on one hand that the administration of the small amount of the drug caused him to be suggestible and therefore he confessed to a crime which he had not committed. On the other hand, Townsend points out an incorrect description of Boone, which description was contained in his confession. Boone had been accosted in a dark area. The two contentions would seem to represent an inconsistent approach, for if Townsend had been suggested into a confession, it would appear that care would have been taken to have seen that the description of the decedent would have been consistent with the facts known to the interrogating person.
 
 
 38
 The coexisting factors which Dr. Freedman found significant and which he felt a person would have to be aware of appropriately to evaluate Townsend's confession were his low intelligence, factors connoted by his history of truancy, his addiction to heroin, his withdrawal symptoms and the fear that they would continue for days unless treated, the fact that he was in police custody and the fact that he had given several confessions in quick succession, some of which seemed unverified by objective facts.[3]
 
 
 39
 In our opinion, none of this is "new" in the factual sense compared to the evidence introduced at Townsend's first federal hearing and considered by this court in determining that the writ should not issue.
 
 
 40
 At the first federal hearing, Dr. Charles D. Proctor testified in Townsend's behalf, as he had at the state trial. He testified that the physical makeup of an individual, his addiction to heroin, his withdrawal symptoms, his age and his prior state can influence or heighten the effect of hyoscine on the individual. He was uncertain as to the possible effect of an individual's intelligence. He testified that a situation conducive to narco-interrogation might be induced by a dose approximately twice the size given Townsend depending upon the prior state of the individual and possibly on the individual himself. He noted that hyoscine induced confessions are often unreliable and that three of Townsend's confessions after the injection were of questionable veracity.
 
 
 41
 Comparing the testimony of Doctors Freedman and Proctor, we conclude that in all material respects they present the same evidence with variations in detail not infrequently found when two different experts testify concerning the same body of knowledge.
 
 
 42
 Further, we find it of significance that Dr. Freedman testified that if he had been presented at the time of the trial in 1955 with basically the same matters which were presented to him at the time of the second hearing in 1970, he would have responded in essentially the same way because by that time he had done his studies. This then was not even a situation in which the progress of medical science had brought about new and changed concepts subsequent to the trial date. Further, the testimony would have been the same in 1963 at the time of the first habeas hearing at which time Dr. Freedman had just arrived in Chicago.
 
 
 43
 As Judge Swygert indicated in United States ex rel. Townsend v. Ogilvie, supra, 334 F.2d at 843, it is not our province to assume appellate jurisdiction over a state judicial proceeding. Yet Townsend in effect is not only asking us to do so but to go further and to weigh the testimony of various experts who gave conflicting testimony on a settled issue and to resolve the credibility in his favor.
 
 
 44
 We do not conceive that new matter exists for a second habeas hearing where that matter consists of a differing expert opinion or interpretation of an unchanged factual situation, particularly where the expert opinion or interpretation was available at the time of the first habeas hearing. The number of successive habeas hearings under such circumstances as here involved would seem, if we were to adopt Townsend's contention, to be equated with the number of experts who could in seriatim come forward with some new theory not previously advanced.
 
 
 45
 There having been no change in the factual or legal background of Townsend's involuntary confession claim since it was considered and rejected by this court, we hold that the district court abused its discretion in again considering such claim and in issuing the writ on that ground. We do not find that this case is sufficiently different from the rationale of Schnitzler, supra, 406 F.2d at 319, and we accept and adopt its well-reasoned conclusion as being grounded on sound judicial policy.
 
 
 46
 The reason for permitting a succession of habeas corpus petitions certainly cannot be equated with, nor justified by, the existing burden on the courts. While the writ should never be denied in the proper case, judicial economy dictates restrictive limitations on reruns.
 
 
 47
 That the trial court could have more competently determined whether a defendant's will was overborne had the circumstances surrounding the statement been more fully explored does not reach the point of being per se a basis for even the first federal habeas hearing. See Procunier v. Atchley, 400 U.S. 446, 91 S.Ct. 485, 27 L.Ed.2d 524, reh. denied, 401 U.S. 966, 91 S.Ct. 966, 28 L.Ed.2d 249 (1971).
 
 
 48
 Having sustained the argument of the respondent that the district court abused its discretion in granting the writ on the involuntary confession ground, we do not consider a number of its other contentions[4] concerning the appropriateness of certain evidentiary rulings and findings of fact of the district court relating to the confession issue.
 
 
 49
 We must, however, deal with findings and conclusions of the district court that the prosecution deliberately withheld from Townsend and the state court the information that hyoscine was colloquially known as a "truth serum" and that information was not developed that its effects could be heightened by environmental factors. In his earlier opinion in this case, Judge Swygert noted that such suppression could present a constitutional issue cognizable in federal habeas corpus. However, he further noted that such information was available to the defense, that the "record is devoid of any showing of suppression" and that to the extent that such information was not presented at the state trial (and we note that much of it was), it was a mere tactical mistake of the defense giving rise to no constitutional claim. 334 F.2d at 843. Nothing new has been added to the record on this score since Judge Swygert's pronouncement.
 
 
 50
 Although this court, as hereinbefore indicated, has previously found no showing of suppression, Townsend nevertheless contends that there was a prejudicial withholding at the time of the original trial of information which would have been helpful to his defense. We agree that certain aspects of subsequent testimony might have been helpful to him. Hindsight frequently is a source of such aid. We cannot agree, however, that there was suppression so as to void the trial. Basically, if there was any withholding, it appears to have been not of factual matters, the same having been as well known to Townsend as to the State.
 
 
 51
 The interpretation to be placed on the factual matters was, as we have noted, a matter for presentation by expert witnesses. For example, Townsend asserts that none of the State's witnesses told the judge or jury that by 1944 the medical literature did not recommend the use of scopolamine in combination with barbiturates for treating withdrawal of narcotic symptoms. We see no more reason for believing that the State's witnesses knew this and deliberately withheld it than for thinking that such information which had been available in the medical literature was for some reason not used by Townsend.
 
 
 52
 Certainly, the various "environmental factors" operating at the time of the confession were known to Townsend and his counsel. The alleged effect of these factors in combination with an injection of hyoscine and the "truth serum" qualities of that drug in sufficient dosages were matters of expert knowledge as available knowledge-wise to the defense as to the prosecution. In fact, the same defense expert who first testified to such effect in a federal hearing had testified for the defense at the state trial.
 
 
 53
 Further, we are not unmindful of Townsend's contention that information was withheld concerning other confessions given by him at the same time as the Boone confession. The record indicates the contrary, that in fact during the trial the State attempted, over defense objections which prevailed, to show that there were other confessions.
 
 
 54
 Insofar as it might be contended that the verity, or lack of verity, of other confessions might reflect on the issue of voluntariness of the Boone confession, such a purely collateral inquiry would seem to have no proper place in the present federal habeas proceedings based on constitutional grounds.
 
 
 55
 Consideration of the question of the verity of other confessions would, inter alia, involve such diverse speculative matters here as the correctness of hearsay statements, whether an acquittal in another case was correct and whether dismissal of prosecution was predicated upon lack of validity of a confession or upon any number of other influential factors which bring about such dismissals, including the fact that one conviction had already been obtained.
 
 
 56
 In short, the inquiry would be endless and the final result less than conclusive. Further we see no legal basis for a valid assumption that lack of convictions of other crimes confessed is necessarily equated with lack of guilt of those crimes.
 
 
 57
 The fact that the trial court did not pursue this inquiry, as unsatisfactory as it would have been, in the absence of suppression by the State does not in any event create a constitutional issue. At most, it arguably is a situation that the trial court could have more competently determined whether the confessor's will was overborne as to the confession in question, Procunier v. Atchley, supra, 400 U.S. at 452, 91 S.Ct. 485, and as such is not the basis for an evidentiary hearing.
 
 
 58
 Townsend presents an arguably new ground in his second petition by alleging that "the whole course of state court proceeding * * * denied petitioner due process of law." However, many of the factors alleged in support of this ground have been previously considered and found without merit. Thus, Townsend points to (1) the use of his confession- but we have found it was not improperly obtained; (2) the fact that he was without counsel for two weeks following his arrest-but that was disposed of in this court's prior opinion, 334 F.2d at 843; and (3) the fact that information was withheld at the state trial-but we have twice noted the lack of suppression thereof.
 
 
 59
 Townsend further maintains that the state court jury was instructed on an erroneous standard by which to test the confession. However, any error in that respect has been cured by a de novo consideration of the propriety of the confession by the federal courts applying correct standards.
 
 
 60
 Townsend also asserts that there was no probable cause for his arrest. Even if we were to consider this contention as one segment of a totality picture, we find little merit in the claim in view of the findings of fact of the district court following the second federal evidentiary hearing. (See Appendix B attached to this opinion.)
 
 
 61
 In any event, the contention of lack of probable cause was made for the first time in petitioner's brief on this appeal. While, as it will be noted hereinafter in this opinion, we are willing, because of the nature of this case, to consider the matter of the death penalty raised in the district court but not in the state court and while we are desirous of termination of litigation of the magnitude of the present case, nevertheless we decline to consider for the first time here an issue never formed in either the state or federal court. Johnson v. Turner, 429 F.2d 1152, 1155 (10th Cir. 1970).
 
 
 62
 Finally, Townsend asserts that he was not provided with a full transcript of the voir dire which would show that the jury was chosen in an improper fashion. There is no evidence of an active denial of the transcript by the State or of any earlier request for its production by petitioner. In any event, the transcript of the voir dire, to the extent taken, was made available to petitioner for purposes of the second federal hearing and we shall shortly consider the merits of the claim based upon its revelations. Our conclusion on the instant issue, however, is that petitioner has failed to demonstrate a denial of due process in the state proceeding.
 
 
 63
 We turn then to grounds presented in the second federal habeas petition based upon the Supreme Court's decision of Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). These, of course, are "new grounds" not previously considered by this court since Witherspoon was decided following disposition of Townsend's first petition. The respondent, however, asserts that the district court should nevertheless have refused to consider them on the ground that Townsend has deliberately bypassed available state remedies as to these grounds. We cannot agree.
 
 
 64
 It is clear that a federal court has the power to discharge a state prisoner held in violation of the federal constitution. Fay v. Noia, 372 U.S. 391, 418, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963); Ex parte Royall, 117 U.S. 241, 251, 6 S.Ct. 734, 29 L.Ed. 868 (1886); and Baldwin v. Lewis, 442 F.2d 29 (7th Cir. 1971). The appropriateness of the exercise of that power is limited solely by considerations of comity. Baldwin, supra. Here, however, we find those considerations overcome by the "exceptional circumstances" of this case. See Ex parte Hawk, 321 U.S. 114, 117, 64 S.Ct. 448, 88 L.Ed. 572 (1944).
 
 
 65
 The Townsend case has been in both state and federal courts for over sixteen years. During all of those years Townsend has lived in the shadow of death. In our opinion, to be more fully developed, Witherspoon indicates that that penalty was unlawfully imposed upon him. We can see neither a purpose nor a justification for further prolonging Townsend's uncertainty. Nor are we willing to compel the expenditure of further judicial resources by requiring the State of Illinois courts to first consider this new issue before we give our attention to it.
 
 
 66
 The Supreme Court held in Witherspoon, supra, 391 U.S. at 522, 88 S.Ct. 1770, that a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction.
 
 
 67
 The Supreme Court expressly directed its attention to the question of retroactivity and held that the standard set out in the Court's decision was retroactive. Id. at 533 n. 22, 88 S.Ct. 1770; see also Maxwell v. Bishop, 398 U.S. 262, 90 S.Ct. 1578, 26 L.Ed.2d 221 (1970). Therefore, insofar as the present issue is concerned, it is immaterial that Witherspoon predated Townsend's state court trial by some 13 years.
 
 
 68
 Townsend's brief characterizes his jury as a "hangman's jury" and asserts that his right to an impartial jury trial was the subject of "blatant violation." These characterizations, we think, are too farfetched. Witherspoon had not been decided and the trial court, as courts did throughout the United States, was excusing for cause on the mere showing of religious or conscientious scruples against capital punishment. The standard has now been set otherwise, however, and although we are unable to say that the particular jury was any more prone to find guilt than would a Witherspoon-guided jury, nevertheless it is our function to determine whether the Witherspoon standard was met.
 
 
 69
 At the time of Townsend's trial the following statutory provision was in effect in Illinois:
 
 
 70
 "In trials for murder it shall be a cause for challenge of any juror who shall, on being examined, state that he has conscientious scruples against capital punishment, or that he is opposed to the same."
 
 
 71
 Ill.Rev.Stat. ch. 38, Sec. 743 (1953).
 
 
 72
 The incomplete record of the jury voir dire proceedings in the state trial reflects that after prospective juror Powaga had given his name and address and data regarding his family he was interrogated and responded as follows:
 
 
 73
 "Q. Mr. Powaga, you have heard the questions that I have asked some previous jurors, have you not? You understand the type of penalties that the law provides for one convicted of the crime of murder, do you not?
 
 
 74
 "A. Yes.
 
 
 75
 "Q. Mr. Powaga, do you have any religious or conscientious scruples against the giving of the death penalty in a proper case?
 
 
 76
 "A. Yes, I do.
 
 
 77
 "Mr. McGovern [Assistant State's Attorney]: You will be excused in this case, for cause, your Honor."
 
 
 78
 Thereupon the court recessed for lunch and Mr. Powaga presumably went about other business. At least being a venireman in the Townsend case occupied him no further.
 
 
 79
 If this was the pattern followed throughout the impaneling of the jury, little further thought would have to be given to the result to be reached as this application of the Illinois statute clearly runs afoul of the Witherspoon standard.
 
 
 80
 The case, however, is not quite this simple for, as we have suggested hereinbefore, the voir dire proceedings were not completely transcribed. As a matter of fact, the transcript is limited to the examination of five prospective jurors.
 
 
 81
 It appears that the court reporter had not been requested by the prosecution, defense or court (and did not volunteer) to take this portion of the state court proceedings. The colloquy preceding the voir dire examination of the five jurors covered by the transcript indicates that the State's attorney in instances of a juror indicating that he had no religious or conscientious scruples against the giving of the death penalty would follow up by questioning the effect of which was that if the facts were such as to indicate that the evidence showed a proper case for a death penalty would the juror then sign a death penalty. The particular form of objection to the questioning by the prosecution had been that the State was attempting to get a pledge from the jurors in regard to capital punishment over and above the lack of conscientious or religious scruples. This is not the situation adverted to in Witherspoon where prospective veniremen while having scruples against capital punishment would not automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them. The situation that developed in the case before us was the reverse situation in that apparently from the colloquy a potential juror had indicated no scruples but when pressed as to whether if the facts were such to indicate that this was the proper case for a death penalty he said he would not sign the death penalty. This apparently surprised not only the court but everyone else concerned.
 
 
 82
 Counsel for the defense objected to the prosecution pressing the question, as it apparently had theretofore, which is indicative to us that all of the persons involved in the trial were proceeding on the theory under the Illinois statute that it was sufficient to challenge for cause on the mere statement of religious or conscientious scruples. In any event, to avoid further misunderstanding as to just what had been said in the questioning, Townsend's counsel asked that the court reporter take the balance of the voir dire examination. Strangely enough the memory of man seems to runneth not to whether the prospective jurors other than the five whose interrogation was transcribed were summarily dismissed for cause in the event of stating a conscientious or religious scruple. No affidavit nor any type of representation appears in the record before us either way on this subject. Hence the record as it stands shows unequivocally only two potential jurors as having been excused via the scruple route. Witherspoon does not reach this issue, if in fact only two jurors were excused in this manner. It could be argued from the language of the opinion that if only two were excluded, the Witherspoon standard would not be applicable. Thus, we note in the Witherspoon decision statements such as the following:
 
 
 83
 "* * * But a jury from which all such men have been excluded cannot perform the task demanded of it." Id. 391 U.S. at 519, 88 S.Ct. at 1775.
 
 
 84
 "* * * Culled of all who harbor doubts about the wisdom of capital punishment-of all who would be reluctant to pronounce the extreme penalty-such a jury can speak only for a distinct and dwindling minority." Id. at 520, 88 S.Ct. at 1776.
 
 
 85
 "* * * But when it swept from the jury all who expressed conscientious or religious scruples against capital punishment and all who opposed it in principle, the State crossed the line of neutrality." Id. at 520, 88 S.Ct. at 1776. (Emphasis supplied.)
 
 
 86
 The issue, however, has been reached since Witherspoon with the result going both ways. The authorities are reviewed in Marion v. Beto, 434 F.2d 29 (5th Cir. 1970), cert. denied, 402 U.S. 906, 91 S.Ct. 1372, 28 L.Ed.2d 646 (1971). That court, however, came to the conclusion that because of the magnitude of the decision to take a human life, it does not follow that the improper exclusion of a relatively small number of the total veniremen examined does not prejudice the defendant's right to an impartial cross section of the community. That court stated, therefore, that the improper exclusion of a single venireman is prejudicial to the rights of the defendant in a capital case.
 
 
 87
 Here, however, while the record is not as clear as we would like it, we do not think that we are required to come to a decision on the Marion situation. A close scrutiny of that part of the jury voir dire proceedings that was transcribed reasonably convinces us that any prospective juror examined who stated either conscientious or religious scruples was excluded from the jury without more. Consequently, the sentence of death cannot be carried out by the State of Illinois. Witherspoon, supra, 391 U.S. at 518-523, 88 S.Ct. 1770; Maxwell v. Bishop, 398 U.S. 262, 90 S.Ct. 1578, 26 L.Ed.2d 221 (1970). However, this determination does not affect the validity of the conviction itself. Witherspoon, supra, 391 U.S. at 522-523 n. 21, 88 S.Ct. 1770.
 
 
 88
 Because of the nature of the federal proceedings before us, we have not directed our attention to the guilt or innocence of Townsend. We do note, however, the statement in the district court's memorandum opinion that "Townsend in his confession gave information which led to the finding of the [Boone] wallet, where he [Townsend] said he threw it, * * *." This damning proof of involvement in the robbery and killing of Boone makes it difficult to conceptualize Townsend's innocence.
 
 
 89
 The final issue to be decided on this appeal stems from the district court's finding that since persons having general objections against the death penalty, or conscientious or religious scruples against its imposition, were excluded from the jury, a jury selected in such a fashion is "more prone to convict and impose a death sentence than a jury composed of a full section of veniremen called."
 
 
 90
 In reaching this determination the district court apparently relied upon studies which have been made for the purpose of investigating whether a jury from which is excluded those opposed to the death penalty is prone to be biased toward a guilty verdict.
 
 
 91
 Of the studies, the only one which appears not to have been in some form before the Supreme Court at the time it decided Witherspoon and its companion case, Bumper v. North Carolina, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968), is the one by Edward J. Bronson.[5] Witherspoon, supra, 391 U.S. at 517 n. 10, 88 S.Ct. 1770; Bumper, supra, 391 U.S. at 545-546 nn. 5 and 6, 88 S.Ct. 1788. The Supreme Court in Witherspoon concluded that the data contained in these studies "are too tentative and fragmentary to establish that jurors not opposed to the death penalty tend to favor the prosecution in the determination of guilt." Witherspoon, supra, 391 U.S. at 517, 88 S.Ct. at 1774 (Footnote omitted.)
 
 
 92
 The court below reached an opposite conclusion based on virtually the same data considered by the Supreme Court in Witherspoon. The only new study was the one by Bronson. We do not find this to be sufficient to overcome the determination reached by the Supreme Court that the date are "too tentative and fragmentary" to establish Townsend's claim.
 
 
 93
 We hold that the record in this case does not adequately support the district court's conclusion that because of the selection process used, Townsend's jury was more prone to convict.
 
 
 94
 Because of our conclusion reached earlier herein that the death sentence cannot be imposed, it is unnecessary for us to consider the other contentions that the imposition of the death sentence under the circumstances of this case would violate Townsend's right to equal protection or that it would constitute a cruel and unusual punishment.
 
 
 95
 Therefore, as in Witherspoon, the result we have reached does not affect the validity of any sentence other than one of death nor does our holding render invalid the conviction, as opposed to the sentence.
 
 
 96
 We therefore reverse and remand the case to the district court with the directions that the State of Illinois be given the option of determining within a reasonable time to be fixed by that court, but not more than four months, whether to (1) resentence the defendant without a retrial on the issue of guilt, provided such procedure is appropriate under the Illinois law, or (2) vacate his conviction and sentence to be followed by a retrial. If neither option is exercised within the time fixed by the district court, the writ must be granted and the appellee released.
 
 
 97
 Reversed and remanded as directed.
 
 APPENDIX A
 
 98
 People v. Townsend, 11 Ill.2d 30, 141 N.E.2d 729 (1957), cert. denied, 355 U.S. 850, 78 S.Ct. 76, 2 L.Ed.2d 60 (1957), rehearing denied, 355 U.S. 886, 78 S.Ct. 152, 2 L.Ed.2d 116 (1957); Townsend v. People, Post-conviction No. 846 (Crim.Ct. Cook County, filed April 28, 1958), aff'd, No. 2522 (Ill.Sup.Ct., filed May 23, 1958), cert. denied, Townsend v. Illinois, 358 U.S. 887, 79 S.Ct. 128, 3 L.Ed.2d 115 (1958).
 
 
 99
 United States ex rel. Townsend v. Sain, No. 58 C 2140 (N.D.Ill., filed Dec. 15, 1958), appeal dismissed, 265 F.2d 660 (7th Cir. 1958), vacated and remanded, 359 U.S. 64, 79 S.Ct. 655, 3 L.Ed.2d 634 (1959), No. 58 C 2140 (N.D.Ill., filed June 24, 1959), aff'd, 276 F.2d 324 (7th Cir. 1960), rev'd 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), sub nom. United States ex rel. Townsend v. Ogilvie, No. 58 C 2140 (N.D.Ill., filed Jan. 13, 1964), rev'd, 334 F.2d 837 (7th Cir. 1964), cert. denied, 379 U.S. 984, 85 S.Ct. 683, 13 L.Ed.2d 574 (1965), No. 58 C 2140 (N.D.Ill., filed April 7, 1965), aff'd, 360 F.2d 925 (7th Cir. 1966), cert. denied, 385 U.S. 938, 87 S.Ct. 304, 17 L.Ed.2d 218 (1966).
 
 
 100
 United States ex rel. Townsend v. Pate, No. 67 C 389 (N.D.Ill., Dec. 8, 1969), petition for writ of prohibition and/or mandamus denied mem. sub nom., Pate v. Perry, No. 18153 (7th Cir., filed Feb. 1970), cert. denied, 399 U.S. 910, 90 S.Ct. 2199, 26 L.Ed.2d 561 (1970); sub nom. United States ex rel. Townsend v. Twomey, 322 F.Supp. 158 (N.D.Ill., 1971).
 
 APPENDIX B
 
 101
 The memorandum opinion of the district court following the second federal evidentiary hearing reads in part as follows:
 
 
 102
 "In the month of December 1953 there occurred a series of brutal assaults in the neighborhood of 38th Street and Michigan Boulevard in the City of Chicago. Johnny Stinson, Jack Boone, Thomas Johnson, Willis Thompson, Joseph Martin and Gus Anagnost were assaulted and robbed. Stinson, Boone, Johnson and Thompson all died as a result of an assault, each made with some hard substance. According to Martin and Anagnost, a brick was the object with which they were assaulted. The similarity of these six assaults led police to believe that the assailant was one and the same in each case. The armed robbery of Joseph Martin took place on December 4, 1953; the assault on Jack Boone occurred on December 18, 1953, and the last assault, on Gus Anagnost, occurred on December 28, 1953. The police undertook a concerted drive to identify and arrest the person or persons guilty of these assaults.
 
 
 103
 "In the early morning hours of January 1, 1954, a police homicide squad, composed of Police Officers Edward Cagney, John Fitzgerald, George Martin and John Corcoran, arrested several young Negro men on suspicion. Among those arrested were George Hare, Oliver Johnson, Theodore Redd and Vernon Campbell (a/k/a Vincent Campbell). The police accused Vernon Campbell of being implicated in the assaults; but he denied any part. They questioned all the others arrested at length. Campbell and the others informed police that Charles Townsend was a likely suspect, that more than once he had been seen with a brick, and that Townsend had said he was going to use it to 'make some money'. The police officers inquired as to when and where they might find him."
 
 
 104
 Campbell, who was a known associate of Townsend, was driven around in a squad car and the arrest of Townsend followed.
 
 
 105
 KERNER, Circuit Judge (dissenting).
 
 
 106
 I respectfully dissent. In this, his second attempt to vindicate himself through the writ of habeas corpus, petitioner Townsend has persuaded the district court that his confession, taken in 1954, was involuntary. The majority reverses the district court and holds that it was an abuse of discretion for it to have considered the claim and issued the writ on that basis.
 
 
 107
 Two issues appear from the record as determinative in this appeal. First, did the district judge abuse his discretion in finding the confession involuntary when he had ruled otherwise in Townsend's prior habeas corpus petition. And, second, was it clearly erroneous for the judge to have found that the confession was involuntarily coerced from Townsend. I have no difficulty, after reviewing the facts and law governing this case, in resolving these issues and concluding that the district judge was correct in his decision.
 
 I.
 
 108
 As to the propriety of the district judge to hear and decide again the involuntariness issue, this is one of a number of cases where this court must, properly I believe, defer to the discretion of the district judge. In this case, our deference is statutorily mandated. A district court clearly has the authority under 28 U.S.C. Sec. 2244(b) to rehear habeas corpus petitions, even if the case produces the same factual and legal points decided in a previous habeas action involving the same petitioner. In pertinent part, Sec. 2244(b) states:
 
 
 109
 * * * [A] subsequent application for a writ of habeas corpus in behalf of * * * [a petitioner] need not be entertained by a court of the United States or a justice or judge of the United States unless the application alleges and is predicated on a factual or other ground not adjudicated on the hearing of the earlier application for the writ, and unless the court, justice, or judge is satisfied that the applicant has not on the earlier application deliberately withheld the newly asserted ground or otherwise abused the writ. [Emphasis added]
 
 
 110
 Section 2244(b) stands for two different propositions. First, it requires a district judge to conduct a second habeas corpus hearing when new facts of constitutional significance are alleged, see Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963). Second, it allows him to conduct a hearing on facts that were adjudicated in an earlier application. Sanders v. United States, 373 U.S. 1, 15, 83 S.Ct. 1068, 10 L.Ed.2d 148 (1963). The second proposition, which applies to the case at bar, grants to the district court discretionary authority to rehear matters previously litigated. Thus, I cannot understand why the majority believes it crucial to decide whether "new" evidence was presented to the district court regarding the confession.
 
 
 111
 The statute incorporates the notion that res judicata does not apply to successive habeas corpus petitions. This principle has been explicitly stated by the Supreme Court [Sanders v. United States, 373 U.S. 1, 83 S.Ct. 1068, 10 L.Ed.2d 148 (1963); Smith v. Yeager, 393 U.S. 122, 89 S.Ct. 277, 21 L.Ed.2d 246 (1968); Salinger v. Loisel, 265 U.S. 224, 44 S.Ct. 519, 68 L.Ed. 989 (1924); Wong Doo v. United States, 265 U.S. 239, 44 S.Ct. 524, 68 L.Ed. 999 (1924); see Brown v. Allen, 344 U.S. 443, 460-465, 73 S.Ct. 397, 97 L.Ed. 469 (1953)], and has its roots in ancient common law and constitutional theory. See Salinger v. Loisel, supra, 265 U.S. at 230, 44 S.Ct. 519. The policies underlying res judicata to which the majority alludes-the hardship, expense and delay to the participants and the burdens on the judicial system from needless and successive litigation-must be outweighed by those of due process and justice, preserved in the writ of habeas corpus. As the Supreme Court stated in rejecting the application of res judicata to successive habeas corpus applications: "Conventional notions of finality of litigation have no place where life or liberty is at stake and infringement of constitutional rights is alleged." Sanders v. United States, supra, 373 U.S. at 8, 83 S.Ct. at 1073.
 
 
 112
 The majority incorrectly relies on United States ex rel. Schnitzler v. Follette, 406 F.2d 319 (2d Cir. 1969), cert. denied 395 U.S. 926, 89 S.Ct. 1783, 23 L.Ed.2d 244 (1969), in holding that the district court abused its discretion in granting the writ on its finding of involuntariness. Schnitzler stands for the proposition that a district court abuses its discretion when it grants a subsequent writ on the same ground which had been ruled upon adversely to the petitioner by a higher federal court. The Court of Appeals in Schnitzler rested its decision on the finding that the district court mentioned "* * * no facts which were not before this court during its consideration of Schnitzler's first application," 406 F.2d at 320. In this case, however, a higher court did not rule upon the voluntariness of Townsend's confession.
 
 
 113
 This court in Townsend's last habeas appeal, United States ex rel. Townsend v. Ogilvie, 334 F.2d 837 (7th Cir. 1964), cert. denied 379 U.S. 984, 85 S.Ct. 683, 13 L.Ed.2d 574 (1965), did not "affirm" the finding that the confession was voluntary, as the majority suggests. The issue before this court was the district court's ruling that certain evidence concerning the confession should have been presented before the jury that convicted Townsend. This court held that "[f]acts relating to the confession which could properly have been brought before the jury on the question of credibility, if not suppressed, can have no possible constitutional significance." United States ex rel. Townsend v. Ogilvie, supra, 334 F.2d at 843. In passing, Judge Swygert noted that the record supported a finding of voluntariness, but stated that the "[p]etitioner by failing to cross appeal presents no issue which challenges the correctness of the district judge's conclusion [that the confession was voluntary]" at 842, n. 2.
 
 
 114
 This is a far different situation from the Schnitzler case, where the issue in the second habeas hearing was previously briefed, argued and resolved by a higher court on appeal. In the case at bar, the issue of involuntariness was not before this court, as it specifically noted. United States ex rel. Townsend v. Ogilvie, supra, 334 F.2d at 842, n. 2. While Schnitzler, may be correct in its holding that a "district court is required to follow a binding precedent of a superior court, and it * * * [abuses] its discretion in declining to do so," 406 F.2d at 322, no binding precedent exists in this case.
 
 
 115
 The discretionary authority of district court judges over second habeas corpus applications is broad:
 
 
 116
 Theirs is the major responsibility for the just and sound administration of the federal collateral remedies, and theirs must be the judgment as to whether a second or successive application shall be denied without consideration of the merits. Even as to such an application, the federal judge clearly has the power-and, if the ends of justice demand, the duty-to reach the merits. Cf. Townsend v. Sain, supra [372 U.S. 293], at 312, 318 [83 S.Ct. 745].
 
 
 117
 Sanders v. United States, supra, 373 U.S. at 18-19, 83 S.Ct. at 1079.
 
 
 118
 This case is an illustration of the wisdom of this policy. Townsend, arrested as a youth, has spent seventeen years incarcerated and the better part of his young adult life condemned to death. He continues to press the claim that his confession was involuntary. The State admits that Townsend was going through withdrawal symptoms at the time of the confession and that he was also under the influence of drugs administered by the police. If the contents of the confession were excluded from evidence, it would be difficult for the State to sustain a conviction. People v. Townsend, 11 Ill.2d 30, 48, 141 N.E.2d 729 (1957) (dissent of Mr. Justice Schaefer). It is for a case such as this that the district judge is given "* * * the power-and, if the ends of justice demand, the duty-to reach the merits * * *" of an issue litigated in a prior application. Sanders v. United States, supra, 373 U.S. at 18, 19, 83 S.Ct. at 1079. As the Supreme Court stated in an earlier appeal by this petitioner:
 
 
 119
 Simply because detention * * * obtained [in violation of fundamental constitutional rights] * * * is intolerable, the opportunity for redress, which presupposes the opportunity to be heard, to argue and present evidence, must never be totally foreclosed. Townsend v. Sain, 372 U.S. 293, 312, 83 S.Ct. 745, 756, 9 L.Ed.2d 770 (1963).
 
 II.
 
 120
 Turning to the issue of the confession, which the majority does not reach, I do not believe that the district court's finding of involuntariness was clearly erroneous. Rule 52, Federal Rules of Civil Procedure. The respondent points to findings in the district court's 71 page decision which it argues are clearly erroneous. Yet, none of these alleged errors would make the finding of involuntariness clearly erroneous. In fact, most of the findings of the district court underlying its conclusion of involuntariness are uncontroverted.
 
 
 121
 The petitioner, a black man, was 19 years old at that time of his arrest. He had been a heroin addict since he was 15 years old, and was administering himself over two dosages a day. His I.Q., which testimony revealed to be between 65 and 83, is near the mental defective range. He had been, as found by the district court, "a boy with ruptures in his family life, with a fifth grade education and a history of truancy from school." At the time of his arrest, he was illiterate.
 
 
 122
 Townsend was arrested at approximately 2:30 a. m., January 1, 1954. After some questioning by the officers, he was placed in a solitary cell where he remained until shortly before 8:00 p. m. that evening. He was not allowed to call an attorney nor his sister, whom he regarded as a mother. At 8:00 p. m., he was placed in a line-up, and, at its conclusion, he was interrogated concerning different crimes. He denied all charges.
 
 
 123
 It was during this time that Townsend was observed to be going through withdrawal from heroin; his last dosage had been taken about two hours prior to his arrest. A State's Attorney testified that Townsend was "holding his stomach and complaining that he was sick and wanted a doctor." The district court found that "he was by 8:30 o'clock in the evening willing to do anything to get narcotics or a doctor to give him some kind of treatment which would afford him relief." At 9:45 p. m., the police doctor treated him for withdrawal. The doctor administered an injection of 1/8 grain of phenobarbital and 1/230 grain of hyoscine. Phenobarbital has a tranquilizing effect, and the subject may experience a sense of euphoria or elation. Hyoscine, also known as "truth serum," had at one time been used as a method of narco-interrogation, but by 1954, had been considered outdated as a technique. Hyoscine has a tendency to cause the subject to hallucinate and become disoriented from his environment. The administration of these drugs to Townsend was in violation of the rules of the Chicago Police Department; the Chief Surgeon of the Chicago Police Department testified that "[i]n all of my experience, we never had a hypodermic needle to give to any patient, regardless of how serious the prisoner is. If he is sick, we take him to the * * * [hospital]."
 
 
 124
 Within minutes of this injection, however, Townsend was interrogated by the officials. By 11:30 p. m., Townsend had confessed to six crimes, including three murders. There is conflicting testimony as to the effect of the interrogation on Townsend. Townsend testified that he did not remember what transpired within that hour following the injection. The district court found that the questioning and Townsend's answers were given by "rote." The officers stated that Townsend appeared normal, although, by the end of the hour, they realized he could not answer any more questions.
 
 
 125
 On the following day, Townsend signed typewritten copies of these confessions. Of the six crimes to which he confessed during the hour-long interrogation, only one resulted in a conviction. That is the one which is the subject of this appeal. Another confession he gave was to a crime for which he was subsequently acquitted. As to the remaining four confessions, Townsend was indicted, but never brought to trial; the State moved and was granted an order to strike all four indictments. The truth of these confessions has been refuted, as I will explain, infra.
 
 
 126
 A confession is voluntary when it is the product of "a rational intellect and a free will." Blackburn v. Alabama, 361 U.S. 199, 208, 80 S.Ct. 274, 280, 4 L.Ed.2d 242 (1960). If the "* * * will [of the accused] was overborne by the interrogation and if he would have remained silent but for the improper influences on him," United States v. Hull, 441 F.2d 308, 309 (7th Cir. 1971), his confession must be held involuntary. Bram v. United States, 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897). The Supreme Court in Townsend v. Sain, supra, 372 U.S. at 307-308, 83 S.Ct. at 754 (1963), an earlier appeal in this case, stated that:
 
 
 127
 These standards are applicable whether a confession is the product of physical intimidation or psychological pressure and, of course, are equally applicable to a drug-induced statement. It is difficult to imagine a situation in which a confession would be less the product of a free intellect, less voluntary, than when brought about by a drug having the effect of a "truth serum."After reviewing the facts adduced in this and prior hearings, the district court stated:
 
 
 128
 This court is convinced that a dosage of 1/230th of a grain of hyoscine and 1/8th grain of phenobarbital at the time he was suffering from withdrawal symptoms in combination with co-existing factors would have left Townsend's mind in a disorientated condition and irresponsible and that under the co-existing factors his mind would have been overborne. * * * If there ever can be a confession obtained that is involuntary and coerced under the totality of the circumstances, this is such a case.
 
 
 129
 I do not believe this conclusion is erroneous.
 
 
 130
 The effect of the dosage on Townsend was testified to below by a psychiatrist, Dr. Freedman. Dr. Freedman stated that hyoscine (or scopalomine) causes amnesia and hallucination. It tends to give its subject a "heightened motivation to cooperate." The actual effect of the drug, he said, must be measured with the "subject's previous background, the stresses, tensions, hopes and fears operating at a given time, the physiological mechanism of action of the drug given, the milieu of contacts at the time, the stimuli to which the subject is exposed at the time." The district court summarized Dr. Freedman's testimony:
 
 
 131
 He testified that scopalomine [or hyoscine] either alone or in combination with phenobarbital was not the proper medication for a narcotic addict and that the administration of scopalomine was the improper medication for Townsend under all the circumstances.
 
 
 132
 ******
 
 
 133
 * * *
 
 
 134
 Dr. Freedman said that in the hundreds of hours he spent examining prisoners under drugs, he was virtually never able to treat the statements given by them as evidence of objective reality but rather as evidence of subjective personality characteristics.
 
 
 135
 From his examination of Townsend and the record, Dr. Freedman found Townsend was at the time of his convession [sic] given hyoscine under various co-existing factors which made him suggestible. He stated Townsend's statements reflected an inner psychic state.
 
 
 136
 The district judge correctly weighed this evidence on the effect of the dosage with other facts on the issue of voluntariness. The judge noted Townsend's young age as well as his lack of education and his low I.Q. He believed Townsend to be psychologically unstable at the time of his arrest because of his four-year addiction to heroin and other emotional problems in his past. The effect of the drug on a person with these traits would render him suggestible and disoriented, and an "easy victim" to the pressures normally existing in custodial interrogations. United States v. Hull, supra, 441 F.2d at 312. Clewis v. Texas, 386 U.S. 707, 87 S.Ct. 1338, 18 L.Ed.2d 423 (1967); Davis v. North Carolina, 384 U.S. 737, 86 S.Ct. 1761, 16 L.Ed.2d 895 (1966); Culombe v. Connecticut, 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961); Reck v. Pate, 367 U.S. 433, 81 S.Ct. 1541, 6 L.Ed.2d 948 (1961); Spano v. New York, 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959); Haley v. Ohio, 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224 (1948).
 
 
 137
 The district court also believed that his physical and emotional strength was further eroded by the fact that he was having withdrawal symptoms while in custody. Dr. Freedman testified that withdrawal started 8 hours after an injection and lasted from 2 to 3 days. Witnesses stated that Townsend was in obvious physical pain prior to the arrival of the police doctor. In addition, Townsend had been held incommunicado by the police for approximately 19 hours. He was not allowed to make a call to anyone. These facts portray a man whose will was seriously impaired. Greenwald v. Wisconsin, 390 U.S. 519, 88 S.Ct. 1152, 20 L.Ed.2d 77 (1968); Clewis v. Texas, supra; Davis v. North Carolina, supra; Spano v. New York, supra; Haley v. Ohio, supra; United States ex rel. Burns v. La Vallee, 436 F.2d 1352 (2d Cir. 1970). I agree with the district court that there is "overwhelming evidence of psychological coercion."
 
 
 138
 Another purpose under the Fourteenth Amendment for excluding involuntary confessions from evidence is that they tend to be unreliable. Jackson v. Denno, 378 U.S. 368, 385, 386, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964). In this case there is strong evidence pointing to the unreliability of the confession. During the hour-long interrogation, Townsend "confessed" to six crimes. The first confession was to a robbery which was the subject of the earlier line-up in which Townsend was placed. The victim had identified someone other Townsend in the line-up as the perpetrator. The second confession was to a crime for which he was subsequently acquitted. The third confession was to the murder of Thomas Johnson. Johnson, prior to his death, stated that his injury had been an accident. Townsend v. Sain, 372 U.S. 293, 306, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963). The fourth confession was to the Boone slaying, which is the subject of this appeal. The fifth involved a robbery for which he was never prosecuted. The last confession was not transcribed because Townsend appeared to be unable to answer questions. Thus, of the six confessions, only one, which is now before us, resulted in a conviction. Some, if not all, of the remaining confessions have been shown to be false. These facts, I believe, support the conclusion that the confession in the case at bar was unreliable and involuntary.
 
 
 139
 As to the remaining evidence supporting Townsend's conviction, the most important was the testimony of Vincent Campbell. I agree with Mr. Justice Schaefer's analysis on this point:
 
 
 140
 [Vincent Campbell] * * * was arrested December 29, 1953. While still in police custody, at 2:30 A.M. on January 1, 1954, he was taken by police officers to Thirty-fifth Street and Indiana Avenue where he pointed out the defendant to the officers who then arrested defendant. At the trial Campbell testified that on an unspecified date in December, 1953, he saw the defendant carrying a house brick and that three or four hours later he saw defendant enter a pool room and lay down a bag containing a brick. As the majority points out, "Campbell informed on the defendant to obtain his own release from custody." If the purpose of his testimony was not to put a brick in the defendant's hand during the time that this crime was committed, it was irrelevant. But for that purpose it was inherently incredible. It requires us to believe that defendant started out to commit an assault with a common house brick and that after committing the crime he carefully wrapped up and preserved the brick. The People v. Townsend, 11 Ill.2d 30, 49, 141 N.E.2d 729, 739 (1957) (dissent of Mr. Justice Schaefer).
 
 
 141
 For these reasons, I would affirm the judgment of the district court and grant the writ.
 
 
 142
 While I disagree with the majority on these issues, I agree with them that the death penalty should be vacated because it violates Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).
 
 
 
 [1]
 Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968)
 
 
 [2]
 Salinger v. Loisel, 265 U.S. 224, 41 S.Ct. 519, 68 L.Ed. 989 (1924); Ex parte Cuddy, 40 F. 62 (S.D.Cal.1889)
 
 
 [3]
 We note that Freedman's testimony dealt with factors influencing the effect of truth serums generally and sodium amytal in particular. His experience with hyoscine was quite limited
 
 
 [4]
 For example, Dr. Freedman testified that he had interviewed Charles Townsend and that he had a tape recording of the interview which at least in part was the basis of his opinion. A motion was made by the respondent for the production of the recording, which motion was denied. In denying the motion the court made a reference both to physician-patient privilege and to the fact that Townsend had only agreed to the recording upon the condition that it be kept confidential. As to the matter of privilege, see Kendall v. Gore Properties, Inc., 98 U.S.App.D.C. 378, 236 F.2d 673, 683 (1956); Taylor v. United States, 95 U.S.App.D.C. 373, 222 F.2d 398, 402 (1955). Dr. Freedman was not a treating physician but had interviewed Townsend for the purpose of testifying and, indeed, had testified. While Dr. Freedman's concern to protect the confidentiality upon which the recording had been done is commendable it would seem arguable as to whether the respondent should be denied access to basic factual data upon which the expert opinion was in part based
 
 
 [5]
 Bronson, On the Conviction Proneness and Representativeness of the Death-Qualified Jury: An Empirical Study of Colorado Veniremen, 42 U.Colo.L.Rev. 1 (1970)