THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
BERNARD BOYKIN, Defendant-Appellant.

First District (2nd Division)    No. 62815

Opinion filed October 18, 1977.

James J. Doherty, Public Defender, of Chicago (Jack L. Uretsky and Donald S. Honchell, Assistant Public Defender, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Iris E. Sholder and Wendy Paul Billington, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE DOWNING delivered the opinion of the court:

Defendant, Bernard Boykin, was indicted for the January 2, 1972 murder of Ronald James Pickens. His first trial on the charge, in August of 1973, ended in a mistrial when the jury was unable to reach a verdict. Defendant waived a jury for his second trial in January of 1975, was found guilty by the court, and sentenced to a term of 14 to 25 years. On appeal, defendant contends that his constitutional and statutory rights to a speedy trial were violated, and that the State failed to prove him guilty beyond a reasonable doubt.

The evidence showed that defendant and George Haney, Jr., homosexual lovers, terminated their 20-month relationship following a quarrel on December 18, 1971. Haney left the apartment the two men had

shared on the third floor of a three-flat building at 1328 East 72nd Street in Chicago. A few days later, defendant burned Haney's clothing, which the latter had neglected to remove from the apartment.

For the next two weeks Haney lived with the decedent and Donald Leslie in an apartment at the Southerland Hotel near 46th and Drexel. Then, on December 31, 1971, Haney and Pickens moved to an apartment across the hall from Leslie's and commenced a homosexual relationship. This relationship was short-lived, however, as Pickens' body was found in the apartment three days later, on January 2, 1972. He had been shot in the head and chest. A pathologist testified that the deceased died as the result of a bullet wound to the head, specifically the brain, that a toxicologic examination indicated point five miligrams percent morphine, and that a contributing cause of death was acute morphine narcotism. It was stipulated that the bullets removed from the body were .32 caliber.

On the evening of January 2, 1972, Haney telephoned the police and accused defendant of the murder. Haney also told the police that the murder weapon could be found in a drawer of a china cabinet in the first floor apartment of the building at 1328 E. 72nd Street occupied by defendant's mother Rosalie Allen and her family. Police officers went to the building in search of defendant and the gun. When they arrived, they first spoke to three men sitting in a car across the street. A man who identified himself as defendant's brother, Stanley Allen, then exited from the building at 1328. Police officers entered the building and began to search for defendant's doorbell, when a man identified as the defendant entered the vestibule and said he was the man they were looking for. Defendant was taken into custody.

Other police officers then received permission to search the Allen apartment for the gun. No gun was found in the place Haney had indicated, but a .22-caliber pistol was found in Mrs. Allen's bedroom under her dresser.

I.

Defendant contends that his constitutional and statutory rights to a speedy trial (see U.S. Const., amends. VI, XIV; *Klopfer v. North Carolina* (1967), 386 U.S. 213, 18 L. Ed. 2d 1, 87 S. Ct. 988; *Barker v. Wingo* (1972), 407 U.S. 514, 33 L. Ed. 2d 101, 92 S. Ct. 2182; Ill. Const. 1970, art. I, §8) were violated when the trial court refused to grant his petition for discharge pursuant to section 103—5 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1973, ch. 38, par. 103—5).[1] The factual basis for this

---

[1] Section 103—5 provides, in relevant part:

"(a) Every person in custody in this State for an alleged offense shall be tried by the court having jurisdiction within 120 days from the date he was taken into custody unless delay is occasioned by the defendant, ° ° °.

contention is that at the time at which this case was to have gone to trial, the State's prime witness, George Haney, was hospitalized with a throat disorder, and allegedly unavailable to testify.

The record reveals that on July 29, 1974, defense counsel requested that the court set a firm date for trial. The court set September 9, 1974. On September 9, defendant answered ready for trial. On motion of the State, the case was continued to September 30. Between September 30 and December 26, the case was continued six times on motion of the State.

On December 26, the defendant again answered ready for trial. The State then indicated that its star witness, Haney, was hospitalized and that he would probably be in the hospital until at least the first week in January, due to a serious internal disorder. The State moved to continue the case to January 3 to determine Haney's condition as of that date and informed the court and counsel for the defendant that if Haney was then unable to testify, the State would request an extension beyond the 120-day term. The case was continued to January 3, 1975. On that day, defendant again answered ready for trial. The State reported that Haney was still hospitalized and indicated that it would file a motion for an extension of the term. Defendant demanded strict proof of the State's need for an extension. The case was continued to January 6, the 119th[2] day of defendant's term. On the 6th, the court considered the State's motion for an extension. Defendant then moved for discharge in a petition which challenged whether the State had exercised due diligence in bringing Haney before the court to testify. The court set a hearing for the next day. At that hearing, the court heard the testimony of Haney's attending physician, Dr. Stron. Dr. Stron testified that Haney was experiencing chest pains and some difficulty in swallowing after eating and when placed in stressful situations. He stated that Haney was undergoing treatment for his condition and that, while he was able to walk and speak without difficulty, in Dr. Stron's opinion, the physical well-being of his patient and the plan of treatment would be endangered by his being placed in a stressful situation. Dr. Stron anticipated that Haney would be better able to undergo stress in about two weeks.

The essence of defendant's speedy trial argument is that by requesting numerous extensions from the court while Haney *was* available to testify, without any reason other than its own convenience, the State failed to

---

o o o

    (c) If the court determines that the State has exercised without success due diligence to obtain evidence material to the case and that there are reasonable grounds to believe that such evidence may be obtained at a later day the court may continue the cause on application of the State for not more than an additional 60 days."

[2] Before the court there was no disagreement between the parties that January 6, 1975, was the 119th day of the 120-day period.

exercise due diligence in bringing defendant to a speedy trial. Defendant maintains that the State wanted to delay defendant's trial merely for its own convenience and that it feared a second trial might once again result in a hung jury. Defendant also contends that there was no proof that Haney was unable to testify. Counsel points out that the hospital records introduced at the hearing indicated that Haney had checked himself out of the hospital on Christmas Day, 1974. Only Dr. Stron's opinion, based primarily on what he had heard from prior treating physicians, indicated that Haney *should* not (as opposed to *could* not) testify.

Defendant relies on this court's opinion in *People v. Bey* (1st Dist. 1973), 12 Ill. App. 3d 256, 298 N.E.2d 184, in which we stated that in requesting an extension of the term under section 103—5(c), the State is required to affirmatively demonstrate its diligence in attempting to obtain evidence material to the case. Defendant also relies on *People v. Shannon* (1st Dist. 1975), 34 Ill. App. 3d 185, 340 N.E.2d 129, where we held that the State had failed to establish due diligence by its failure to locate its witnesses until just a few days before the trial was to commence.

■■ We believe that the State has made a sufficient showing of diligence, and that it was within the discretion of the trial court to grant the petition for an extension. Defendant's argument was specifically rejected by this court in *People v. Robinson* (1st Dist. 1976), 41 Ill. App. 3d 433, 354 N.E.2d 551. In *Robinson*, a material witness became unavailable to testify against the defendant when she was required to leave the State to care for her sister who was seriously ill. Defendant argued on appeal that the State was not diligent because it did not bring the case to trial while the witness was available and because it allowed the witness to leave the State. We stated:

> "While we agree that a criminal trial should not be unnecessarily delayed, we find no mandate in the language of the Four Term Act (Ill. Rev. Stat. 1973, ch. 38, par. 103—5) which requires that a person held in custody be tried within a shorter period than 120 days. Furthermore, we find no merit in defendant's contention that the State's failure to bring this case to trial sooner should have been the determinative factor in the trial court's evaluation of the State's diligence. Manifestly, it was precisely for the type of unexpected delay here present that the legislature intended to provide in subsection (c)." 41 Ill. App. 3d 433, 435.

There was no way that the State could have anticipated Haney's hospitalization. The court and counsel for the defendant were informed of the problem on December 26, 1973, and were aware of the possibility that Haney would not be available prior to the end of the 120-day term. As was the case in *Robinson*, this was precisely the type of delay the legislature anticipated in subsection (c).

*People v. Shannon,* cited by defendant, is distinguishable. There, it was possible for the State to have known, far in advance of the trial, that two of its material witnesses who were Chicago police officers would be on vacation at the time on which the 120-day term would end.

## II.

Defendant contends that the evidence adduced at trial was insufficient to prove him guilty beyond a reasonable doubt.

The principal evidence against defendant at his trial consisted of the testimony of Haney and a letter defendant wrote to Haney from his prison cell while awaiting trial. Haney testified that he and decedent were asleep in their apartment in the Southerland Hotel on the morning of January 2, 1972. At about 11:30 a.m., they were awakened by Donald Leslie and some other friends. They all went across the hall to Leslie's apartment. Haney remained there for about an hour, after which he decided to return to his own apartment. When he left Leslie's apartment, defendant was waiting for him in the hallway. Defendant said he wanted to talk, but Haney refused. Defendant then pulled out a gun and ordered Haney to let him in the apartment. Once inside, defendant asked of the whereabouts of decedent. Haney would not tell him. Defendant then left Haney in the apartment for a time[3] and returned with decedent. He told decedent to sit down and began to question the two regarding their relationship. Asked why he hadn't told defendant about his new lover, Haney responded that it was none of defendant's business. Defendant then made a statement to the effect that they ought to be able to "settle this thing without fighting and guns." Defendant asked Haney if he loved the decedent. When he responded that he did, defendant struck him in the face with the gun, causing a bruise. Decedent attempted to come to Haney's aid, but defendant pushed him back into his chair. Defendant then asked decedent if he loved Haney. When decedent responded that he did, defendant shot him in the head. The force of the blast was so great that decedent fell backwards over the chair in which he had been sitting.

Haney screamed and begged defendant to kill him too. Defendant put the gun to Haney's head, but could not bring himself to pull the trigger.

Defendant then ordered Haney to dress and come with him. As Haney dressed in the bedroom, defendant spoke of his hatred for decedent and suggested that he ought to shoot him again to make sure he was dead. Haney then heard a second shot. He ran back in to the room where decedent lay, but defendant would not let him look at the body. Haney

---

[3] Just how long defendant was gone is a matter of dispute. At the first trial, defendant maintains, Haney's testimony was that defendant was absent from the apartment for 30 minutes. At the second trial, his testimony was that defendant was gone only 30 seconds.

maintained, however, that he was able to discern that while decedent's breathing was slower, he was still alive at that point in time.

Haney and defendant left the hotel at 2:30 or 3:30 p.m. and went to defendant's apartment. They took public transportation and walked a portion of the route. As they walked, defendant removed some cartridges from the cylinder of the gun and threw them onto some nearby railroad tracks.[4]

When they reached their destination, they went into defendant's bedroom. They spent the next four or five hours there, engaging in conversation and homosexual acts. Haney insisted that he submitted only out of fear of the defendant. During this time, defendant placed the gun on a window sill in the room. Defendant discussed the idea of returning to the hotel to make sure decedent was dead by throwing his body out of the window. Defendant also wanted to clean up the apartment to remove any evidence of his having been there. Haney begged him not to go back to the hotel.

At some point in the afternoon, defendant and Haney left the bedroom for a brief conversation with John Dyes, who now shared the apartment with defendant,[5] and Robert Gauthney, Dyes' cousin. They then returned to the bedroom and discussed defendant's alibi. Defendant said they should go to Haney's mother's home and say that they had been there the entire evening. Haney was to deny that he had been with the decedent that day. Haney, out of fear, agreed to do as he was told.

Haney then left the apartment with defendant en route to his mother's home. They walked down the stairs and stopped for a few minutes at the apartment on the second floor of the building, occupied by Charlene Martin and her family, to obtain change for the bus. According to Haney, neither he nor defendant actually entered the Martin apartment, but waited in the hallway. After that, they stopped at the Allen apartment on the first floor and hid the gun in the china cabinet. Haney testified the gun belonged to defendant's mother, Mrs. Allen. He knew this because she had shown it to him on a prior occasion. Usually, the gun was kept in Mrs. Allen's bedroom, but on this occasion, the bedroom door was locked and there was no one in the apartment to let them in.

During the bus ride to Haney's mother's home, defendant spoke again of returning to the Southerland Hotel to throw decedent's body out of the window.

---

[4] Haney testified that he gave this information to the police. However, according to the State, none of the police reports contained any reference to this incident. None of the police officers who testified at trial could recall being told of this. In any event, no such cartridges were ever recovered.

[5] The record indicates that while Dyes was also a homosexual, his relationship with defendant was platonic. They merely shared the apartment.

At Haney's mother's home, Haney and defendant engaged in conversation with the family, ate dinner, and helped to take down a Christmas tree. Defendant left there around 9:30 or 10 p.m. alone.

Haney then related the day's events to his mother and telephoned Mrs. Allen. He told Mrs. Allen what had happened and asked her to hide the gun so that defendant couldn't use it again. According to Haney, Mrs. Allen acknowledged finding the gun in the china cabinet before their conversation ended but stated that it wasn't her gun. Haney's mother then called the police.

Haney described the gun used in the killing as small, with a silver barrel and a brown handle. He stated that the gun introduced into evidence, the .22 recovered from the Allen apartment, was not the gun used in the murder.

On cross-examination, defense counsel sought to illustrate Haney's failure to escape from defendant, despite numerous opportunities, and his failure to report many critical details of his testimony to the police. Haney maintained that his fear of the defendant precluded any attempts at escape, and insisted that he had reported everything to the police. Haney also testified that defendant had threatened to kill him on at least two prior occasions.

Haney's testimony was corroborated by that of Donald Leslie.[6] Leslie confirmed that he had awakened Haney and decedent that afternoon, and that they had come to his apartment. After a while Leslie decided to take a shower. When he left the room, Haney and decedent were still there. Decedent was cooking. While in the shower, he heard Haney leave the apartment. A few minutes later he heard a knock at the door and asked decedent to answer it. He heard decedent leave the apartment. He heard a loud bang and a second bang a few minutes later. He knocked on the door of Haney's apartment, but there was no answer. Later that evening, when the police arrived at the hotel, Leslie saw the body of the decedent lying on the floor of the apartment.

The other critical piece of evidence against defendant was an unusual letter he wrote to Haney while incarcerated awaiting trial. The letter, a long and remorseful love letter, read, in pertinent part:

" * * * I hope you will forgive me for everything I have done. * * * I have to try to take the opportunity to tell you that I'm begging to be forgiven. * * * Remember all the arguments we used to have about the house. You always said I thought more of my possessions than I did of you. Well, now there are no color tv's, no crystal chandeliers, no furniture from John M. Smyth. I have no telephone, no charge accounts, no fur coats, no wardrobe. I don't

---

[6] Leslie was deceased at the time of defendant's second trial. His testimony at the first trial was admitted by stipulation.

have anything any more and feel that now, I no longer have you either. I only wanted to prove to you I loved you. I thought you loved me too. * * * Were you only planning to put me here? Do you really know how serious this really is? * * * Do know that my life ended on January 2 at 10:30 * * *. * * * We're gonna fight this thing. We're gonna fight it hard. The jury should find me innocent. I haven't killed anyone. Maybe you don't believe it but, *nobody* is dead, no one at all. There is no one alive but you and me * * *. I'm here on your word baby. And you can't revoke it cause then they'd try to jam you. * * *"

The defense was alibi. On his own behalf, defendant testified that he went to the Southerland Hotel to see Haney at about 4 a.m. on January 2, 1972. According to defendant, Haney had been bothering him with visits and phone calls and he wanted these to stop. Haney wouldn't speak to him then, saying that he had company and that he didn't feel well. He asked defendant to meet him at the side entrance to the hotel at 3:30 or 4 p.m. that afternoon. He went back to the hotel for the scheduled rendezvous. When Haney arrived, his clothing was disheveled and his shoes were untied. Defendant assisted Haney in tying his shoes. Haney insisted that they leave the hotel. They walked to defendant's apartment to talk. Although there were many pedestrians and cars on the street as they walked, Haney made no attempt to escape. Defendant denied that he had held a gun on Haney. He also denied throwing any shell casings on any railroad tracks, or having any weapons in his possession.

When they arrived at the apartment, they went into the bedroom for their talk. Defendant tried to apologize for burning Haney's clothes. They spoke and made love for about one-half hour. Defendant then left Haney in the bedroom and spoke briefly to the others in the apartment. A few minutes later, he and Haney took a bath together. Defendant maintains there were no weapons in the bathroom and that Haney was there voluntarily.

Defendant then left Haney alone again while he went down to his mother's apartment to check on his brother, Ricky Allen, who was at home sick that day. When he returned, Haney insisted they go to his mother's home for no apparent reason. They left the apartment and stopped at the Martins to obtain change for the bus. Haney did not enter the apartment, but waited in the hall for approximately 10 minutes while defendant was inside. When he went back out into the hall, Haney was still waiting. They then went to Haney's mother's where they talked, ate, and took down the Christmas tree. Defendant left there, alone, and returned home. A few minutes later, his brother Stanley came up and told him that Haney had just called and told his mother that he had shot someone and that the police were coming to arrest him. Incredulous,

defendant called Haney, who confirmed the report. Defendant gave himself up to the police shortly thereafter.

Portions of defendant's testimony were corroborated by other witnesses: Robert Gauthney testified that he was visiting with John Dyes that day. He first saw defendant at approximately 3 p.m., prior to the time defendant said he left for the rendezvous with Haney at the hotel. Gauthney again saw defendant at around 5, 5:30 or 6 p.m., when the latter came from the rear of the apartment and engaged in a brief conversation. He did not see Haney until later that evening as he was about to leave for a church service with Dyes and a man called Ira Echols. At that time, Haney approached and engaged in a brief conversation, after which he returned to the rear of the apartment. Defendant and Haney were alone in the apartment after they left. John Dyes gave a similar account. The prior testimony of Ira Echols was admitted by stipulation. Echols confirmed seeing Haney as he was preparing to leave for church with Gauthney and Dyes. Charlene Martin testified to defendant's good reputation in the community and confirmed that defendant had come to her apartment that evening looking for change for the bus. Haney, who was afraid of her dogs, had remained outside the apartment. She testified that while defendant was in the apartment, the door was closed. Cindy Garrett and Alana Parker, Charlene Martin's daughters, gave similar accounts. Ricky Allen, defendant's brother, testified that he had seen defendant at 12 or 1 p.m. that day and again at about 6 p.m. He testified that after his mother received the phone call from Haney, she acted "hostile" and looked for the gun where Haney had told her, but did not find one. She found only an old "piece of gun," which she gave to the police. Stanley Allen, another of defendant's brothers, gave a similar account of his mother's actions following receipt of Haney's phone call. Rosalie Allen, defendant's mother, testified that she had found no gun in the china cabinet and denied telling Haney she had found one. She admitted ownership of the .22-caliber pistol introduced into evidence, but denied ever showing it to Haney.

Defendant was given the opportunity to explain the letter. He replied that it was motivated by his inability to understand what he had done that would cause Haney to make such serious charges. He also was trying to apologize for having burned Haney's clothes. His statement in the letter that, "I only wanted to prove to you that I loved you," was a reference to defendant's frustrated attempts to please Haney by buying things for their apartment. Haney had interpreted these actions as meaning that defendant cared more for possessions than for him.

Following the presentation of the evidence, the trial court found the defendant guilty as charged. In reaching this conclusion, the court

indicated that the love letter was highly persuasive of defendant's guilt, stating:

"I just cannot believe that an individual would write a letter such as the defendant did here. It's a carefully worded letter, by the way. It's sad to say this is one of the most intelligent defendants I have ever seen in my life. It's a carefully written letter not to pin him down. * * *"

The law is well settled that the testimony of a single witness, who had ample opportunity to observe the defendant at the scene of a crime under favorable conditions, if positive and credible, is sufficient to support a conviction even though the defense has contradicted that testimony. In a bench trial, the credibility of witnesses and the weight to be given their testimony are matters for the determination of the trial court. The trial judge, as the trier of fact, is in the best position to determine the credibility of the witnesses before him. A court of review will not substitute its judgment unless the proof is so unsatisfactory as to justify a reasonable doubt of defendant's guilt. See *People v. Dees* (1st Dist. 1977), 46 Ill. App. 3d 1010, 361 N.E.2d 1126, 1137; *People v. Owens* (1st Dist. 1977), 45 Ill. App. 3d 1012, 360 N.E.2d 481, 484.

■■ The record in this case clearly indicates that there was sufficient evidence before the trial court which, if believed, would establish defendant's guilt beyond a reasonable doubt.

In essence, the issue in this case is the credibility of the witnesses. Despite defendant's protestations to the contrary, Haney's testimony was neither uncorroborated or improbable, nor so unreasonable as to raise a reasonable doubt of defendant's guilt. As noted previously, Haney's testimony was generally unimpeached on cross-examination. Various inconsistencies in his testimony, highlighted by defendant in his arguments to this court, are insubstantial. In fact, Haney's testimony was materially contradicted only by defendant's alibi. The trial judge was able to observe the demeanor of the witnesses on the stand, an important factor in judging their credibility.

As to the defendant's contention that the trial court placed undue emphasis on the letter, while the letter is subject to differing interpretations, the defendant availed himself of the opportunity to place his interpretation before the court. Defendant has not argued that the letter was not admissible under the rules of evidence. The issue, then, was squarely before the trial court, and was decided adversely to defendant.

Finally, defendant has devoted a considerable portion of his brief before this court to the argument that Haney's testimony was shown to be false by the fact that a pathologist's examination of the decedent's body indicated the presence of a lethal dose of morphine. Defendant argues

that decedent was suffering from the effects of morphine narcotism, and would have been in a comatose state at the time immediately preceding his death. Decedent would thus have been unable, as Haney testified, to carry on a conversation, or to have attempted to come to Haney's assistance when defendant hit him with the gun. However, while the record shows that defendant's trial counsel was aware of the pathologist's findings, he chose, for whatever reason, not to argue the point before the trial court. We will not, therefore, consider this argument.

The judgment of the circuit court of Cook County is affirmed.

Affirmed.

PERLIN and PUSATERI, JJ., concur.