THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JOSEPH GOODE, Defendant-Appellant.

First District (4th Division)   No. 78-721

Opinion filed June 7, 1979.

James J. Doherty, Public Defender, of Chicago (Donald S. Honchell, Assistant Public Defender, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Paula M. Daleo, Assistant State's Attorney, of counsel), for the People.

Mr. PRESIDING JUSTICE JIGANTI delivered the opinion of the court:

The defendant, Joseph Goode, appeals his conviction for armed robbery (Ill. Rev. Stat. 1973, ch. 38, par. 18—2), contending that the trial court erred when it denied his motion to suppress certain admissions he made to the police and a lineup identification of him. The defendant claims that both were the result of an illegal detention and the failure of the police to adequately apprise him of his constitutional rights.

At a pretrial hearing on the motion to suppress, two Chicago Police Department Officers, Kenneth Gorman and James Timmel, said that they initially arrested the defendant for a burglary which was reported to them by the defendant's aunt, Earlean Farland. (The officers also referred to Farland as Earlean Field and, at times, described her as the defendant's

mother.) According to Gorman, the officers visited Farland's home on November 12, 1974, in response to Farland's report and spoke with her and her daughter. The defendant, who lived with them, was not at home. Both told the officers that they believed the defendant took a TV set from the daughter's room. Farland also claimed that the defendant took a shotgun from her. According to Gorman, on a subsequent visit, again while the defendant was absent, Farland and her daughter told the officers that when they confronted the defendant with accusations of theft, the defendant told them "if he needed money he would stick up an IC station again."

Gorman testified that upon hearing this he returned with Timmel to the police station and sought information from a robbery unit investigator, John Pappas, concerning recent robberies at a nearby Illinois Central (IC) railroad station. Gorman said Pappas told him about an armed robbery at the 121st Street IC station in Chicago.

The officers went back to the Farland home a third time and arrested the defendant for the burglary of the TV set. They advised him of his constitutional rights and took him to the police station. Subsequently, Farland's daughter refused to sign a complaint against the defendant for the theft of the TV. Rather than releasing the defendant, Gorman and Timmel then questioned him about the robbery at the IC station. The defendant said he did not commit that robbery but that he was aware it occurred. The officers took the defendant to another part of the police station, turned him over to Pappas and his partner, Kenneth Christiano, and told them that the defendant was a possible suspect in the robbery at the 121st Street IC station.

Officer Timmel's testimony corroborated the outline of events testified to by Gorman but disagreed with several details of Gorman's account. Timmel remembered the initial contact with the Farlands occurred on the 14th of November not the 12th as Gorman had testified, although later in his testimony, Timmel does describe a visit to the Farland home on November 13, 1974. Timmel suggests that the first session with Pappas, the robbery investigator, occurred on the 14th, not the 13th of November as Gorman said. Further, Timmel recalls that only Farland, and not her daughter, spoke about the defendant's statement concerning the IC robbery. Finally, Timmel referred to Farland's daughter as "Dorothy" not "Deborah" as Gorman testified.

The robbery investigators, Pappas and Christiano, also testified at the preliminary hearing. Pappas described Timmel's initial request for information concerning an IC robbery, but did not recall speaking to Gorman about it. Pappas said that on November 14, 1974, Gorman and Timmel brought the defendant over to him and his partner and told them that they suspected the defendant of participating in an IC robbery based

on information supplied to them by a member of the defendant's family. Christiano immediately warned the defendant of his constitutional rights, saying, according to Pappas:

"He had a right to remain silent, that anything he said would and could be used against him in a court of law. That he had a right to have an attorney present upon questioning. If he so desired an attorney and could not afford an attorney, one would be appointed to him."

Christiano stated that the defendant told him he understood each of those rights. The officers said that after 10 minutes of questioning, the defendant admitted committing the IC robbery. The officers did not obtain a written statement from the defendant. The robbery victim, Alice Carlson, testified that she chose the defendant out of a lineup at the police station as the man who committed the robbery.

The defendant and his aunt, Farland, also testified. Farland admitted that her daughter had reported the theft of the TV set to the police but Farland denied that she ever spoke with the police prior to the defendant's arrest. She specifically denied saying anything about an IC station robbery. The defendant said that immediately after his arrest he denied taking the TV set and the shotgun the police accused him of stealing. He said that although he told the police he heard about a robbery at the IC station, he never admitted to them that he committed it.

At the jury trial on the armed robbery charge, both Carlson's lineup identification and the defendant's oral admission of the crime were admitted into evidence. Upon conviction, the defendant was sentenced to imprisonment for 4 to 7 years.

The defendant first complains that his detention in the police station for questioning about the IC robbery, after the burglary complaint was dropped, was illegal and that its fruits, his admissions and the lineup identification by Carlson, should be suppressed. He argues that he should have been released when the burglary charges against him were dropped and that his continued detention for investigation purposes was an arrest merely for questioning which is without sanction of law. *People v. Edge* (1950), 406 Ill. 490, 94 N.E.2d 359.

■■ By not releasing the defendant after the burglary charges were dropped and by holding him in custody at the police station for questioning about the IC robbery, Timmel and Gorman "arrested" the defendant. (See *People v. Ussery* (1974), 24 Ill. App. 3d 864, 867, 321 N.E.2d 718, 720; *People v. Attaway* (1976), 41 Ill. App. 3d 837, 846, 354 N.E.2d 448, 456.) An arrest such as that, without a warrant, has to be based on probable cause: a reasonable belief that the person being arrested has committed an offense. (Ill. Rev. Stat. 1973, ch. 38, par. 107—2(c); *People v. Padilla* (1979), 70 Ill. App. 3d 406, 387 N.E.2d 985.) The

issue in the case, then, is whether the trial court was correct in its determination that there was probable cause to arrest the defendant for the robbery of the IC station.

A finding by the trial court that probable cause to arrest existed will not be disturbed unless it is manifestly erroneous. (*People v. Clay* (1973), 55 Ill. 2d 501, 304 N.E.2d 280.) We believe that the finding of probable cause here is well within the limits of that standard. The information supplied to the police by Farland concerning the defendant's statements about the IC robbery coupled with knowledge that such a robbery took place was sufficient to generate in the police a reasonable belief that the defendant committed a robbery. (*Padilla*.) Further, although there were inconsistencies in the testimony of the arresting officers, Gorman and Timmel, and an outright denial of their story by Farland, we cannot say that the court was wrong in believing the police testimony over the defendant's version of the events. The issue of credibility should be resolved by the trier of fact, who is in the best position to determine it. See *People v. Boykin* (1977), 54 Ill. App. 3d 220, 229, 369 N.E.2d 219, 226.

The defendant next contends that the *Miranda* warnings recited to him by Christiano were insufficient to notify him about his right against self-incrimination. Specifically, he claims that because he was informed of "his right to an attorney during questioning" before he was told that if he was indigent "an attorney would be provided for him," he was left with the mistaken impression that an appointed lawyer would not be provided during the interrogation.

In *People v. Prim* (1972), 53 Ill. 2d 62, 67, 289 N.E.2d 601, 604, the Supreme Court of Illinois held that where a defendant had been informed that he had a constitutional right not to give a statement, followed by advice that he had a right to an attorney during questioning, "he was clearly told that he had a right to have an attorney present at the contemplated interrogation and not at some future time." And when the same defendant was next told that if he could not afford an attorney, " 'we would get one for you' he was clearly told that an attorney would be provided at the interrogation and not at some future proceeding." (53 Ill. 2d 62, 67, 289 N.E.2d 601, 604.) Similarly in this case, the order in which Christiano recited the *Miranda* warnings to the defendant was, as in *Prim*, sufficient to inform the defendant that an appointed attorney would be available to him during questioning.

Since the defendant's conviction for armed robbery was not based on evidence tainted by an illegal arrest or defective *Miranda* warnings, it is affirmed.

Affirmed.

LINN and ROMITI, JJ., concur.