Timothy Powell was convicted of both counts of an indictment charging him with a capital offense involving the robbery and murder of Esther Herchenroeder, Ala. Code 1975, §13A-5-40(a)(2), and a capital offense involving the murder of Esther Herchenroeder during a burglary, § 13A-5-40(a)(4). Sentence was fixed at *Page 592 
death. Powell raises seven issues on this appeal from that conviction. Because one of those issues, the prosecutor's striking of black jurors in violation of Batson v. Kentucky,476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), has merit and necessitates a reversal and remand for new trial, we shall address the only remaining issue likely to recur upon a retrial, the legality of Powell's arrest.
 I
Powell, a black man, was tried by an all-white jury following the prosecution's use of 13 out of its 16 peremptory challenges to eliminate black potential jurors. Defense counsel timely moved to quash the jury panel based on the State's alleged discriminatory use of its peremptory challenges, in violation of Batson v. Kentucky, supra, and Ex parte Branch,526 So.2d 609 (Ala. 1987). Apparently finding that the defense had established a prima facie case of racial discrimination, the trial court required the prosecution to state the reasons for its strikes, and the following reasons were given:
 1. Mrs. Kennebrew — expressed some reservations about imposing the death penalty; some dissatisfaction with the police department's handling of a burglary investigation involving her; stated that she would "have to be satisfied" with the police department.
 2. Mrs. Williams — expressed reservations about imposing the death penalty; stated that she had an uncle who was falsely prosecuted and, in fact, served 27 years until he was pardoned or released; testified for her grandson in a rape trial; and had a brother who was either the victim or the defendant in a murder case.
 3. Mr. Byrd — had been charged with DUI in 1972; carnal knowledge, sexual assault, and drawing a weapon in 1974; and speeding in 1984.
 4. Mr. Jackson — knew a relative of the defendant and expressed concern about having to face that person as a participant in this trial; his nephew was a defendant in a burglary case; and he was a teacher. In the prosecutor's experience with four other capital cases, teachers were more forgiving and less prone to impose the death penalty.
 5. Mr. Nearer — had been prosecuted for concealing identity, public nudeness, and possession of marijuana.
 6. Mrs. Hammond — expressed some dissatisfaction with the police department's handling of a theft she reported; had three running-a-red-light and two speeding charges within the last 2 1/2 years; was 25 years old. In the prosecutor's experience, young people were less likely to support the death penalty, and the defendant in this case was young (23 years old).
 7. Mr. Hall — was young (22) and single; might identify with the defendant.
 8. Mr. Grisham — was young and single; smiled at the defendant.
 9. Mr. McCombs — had a family member who had been charged with a crime.
 10. Mrs. McGhee — young (24) and single; looked away from the prosecutors when introducing herself.
 11. Mr. Sellers Williams — young (26) and single; had two traffic violations (improper turn and improper tag) within the last year and a half.
 12. Mrs. Urghart — 30 years old; two traffic violations (improper turn and running a red light) within the last 10 years.
 13. Mr. Joseph Williams — retired school principal married to a retired teacher; had a recent speeding charge.
The trial court found all of the reasons racially neutral and overruled the motion to quash. On motion for new trial, the defense contended that certain of the State's reasons, specifically those relating to age and minor traffic offenses, were a sham or "ruse" to eliminate all blacks from the jury. In support of this motion, the defense introduced evidence that the ages of the 12 white jurors who tried the case were, at the time of trial: 51, 38, 37, 36, 33, 30, 30, 28, 26, 24, 24, and 23.
The trial court made funds available to the defense to secure the driving records of the 12 white jurors who did serve, and those records reveal the following: *Page 593 
 1. Seven of the 12 white jurors had received speeding tickets within five years of trial. Most of these tickets were within two years of trial.
 2. One of those 7 had received six speeding tickets and one ticket for improper lane changing within the last five years. This juror was 28 years old.
 3. Another one of those 7 had received three speeding tickets, one ticket for improper passing, and one ticket for failing to stop at a stop sign within four years of trial. This juror was 23 years old.
The State submitted an affidavit indicating that at the time of striking the jury it did not have knowledge of the driving records of 4 of the white jurors who ultimately served. Three of those 4 had no records for speeding and 2 had been involved in motor vehicle accidents. The State did not claim to have been unaware of the driving records of the 4 other white jurors who served and who had traffic offenses.
The trial court's determination that the State's striking of black venirepersons Mrs. Kennebrew, Mrs. Williams, Mr. Byrd, Mr. Jackson, Mr. Nearer, Mrs. Hammond, and Mr. McCombs (numbers 1-6 and 9 above), was racially neutral is not "clearly erroneous" and must be upheld. We have serious doubts about the determination as to Mr. Grisham and Mrs. McGhee (numbers 8 and 10 above), and we find "clearly erroneous" the ruling as to Mr. Hall, Mr. Sellers Williams, Mrs. Urqhart, and Mr. Joseph Williams.
In Ex parte Branch, our Supreme Court observed:
 "Once the prosecutor has articulated a nondiscriminatory reason for challenging the black jurors, the other side can offer evidence showing that the reasons or explanations are merely a sham or pretext. [People v.] Wheeler, 22 Cal.3d [258] at 282, 583 P.2d [748] at 763-64, 148 Cal.Rptr. [890] at 906 [1978]. Other than reasons that are obviously contrived, the following are illustrative of the types of evidence that can be used to show sham or pretext:
". . .
 "2. There was a lack of questioning to the challenged juror, or a lack of meaningful questions.
 "3. Disparate treatment — persons with the same or similar characteristics as the challenged juror were not struck. Slappy [v. State] 503 So.2d [350] at 354 [Fla. Dist. Ct. App. 1987]; [People v.] Turner, 42 Cal.3d [711] at 725, 726 P.2d [102] at 110, 230 Cal.Rptr. [656] at 664 [1986]; Wheeler, 22 Cal.3d at 282, 283 [583] P.2d at 760, 148 Cal. Rptr. at 906.
". . .
 "6. '[A]n explanation based on a group bias where the group trait is not shown to apply to the challenged juror specifically,' Slappy, 503 So.2d at 355. For instance, an assumption that teachers as a class are too liberal, without any specific questions having been directed to the panel or the individual juror showing the potentially liberal nature of the challenged juror." 526 So.2d at 624.
In view of the fact that five members of the jury were in their twenties (the average age of the jury was only 31 years, 8 months) and seven members of the jury had had traffic offenses equally as serious as those of the black venirepersons who were struck by the State, we cannot escape the conclusion that the State engaged in the type of "disparate treatment" denounced in Branch. White "persons with the same or similar characteristics as the challenged [black] juror[s] were not struck." Branch, 526 So.2d at 624. See Acres v. State,548 So.2d 459 (Ala.Cr.App. 1987) (on return to remand) (validity of prosecutor's reasons for striking two black venirepersons because they had had traffic citations did not "stand up under close scrutiny" when record revealed that two white jurors who served on jury had similar traffic offenses). The State simply did not remove white persons for the same reasons given by the State for removing blacks. Compare Currin v. State,535 So.2d 221 (Ala.Cr.App. 1988) ("A reasonable conclusion . . . is that [the prosecutor] applied the racially-neutral criteria of education, employment, and demeanor to all jurors, whether black, [or] white. . . .") (quoting United States v. Allen,666 F. Supp. 847, *Page 594 
854 (E.D.Va. 1987)). See generally State v. Antwine,743 S.W.2d 51, 65 (Mo.), cert. denied, Antwine v. Missouri, ___ U.S. ___,108 S.Ct. 1755, 100 L.Ed.2d 217 (1988), wherein the court found it highly relevant to consider "whether similarly situated white veniremen escaped the State's challenges."
"[I]t is possible that an attorney, although not intentionally discriminating, may try to find reasons other than race to challenge a black juror, when race may be his primary factor in deciding to strike the juror." Ex parteBranch, 526 So.2d at 624. The defense evidence adduced on motion for new trial, specifically the ages and driving records of the jury, convincingly established that race was the primary factor in striking venirepersons Mr. Hall, Mr. Sellers Williams, and Mrs. Urqhart, and that the State's articulated reasons for striking those persons were "contrived to avoid admitting acts of group discrimination." Id.
The trial court's failure to grant the motion for new trial was, therefore, in error. " '[A] finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' Anderson [v.Bessemer City], 470 U.S. [564 at] 573, 105 S.Ct. [1504] at 1511, [84 L.Ed.2d 518] [1985] citing United States v.United States Gypsum, 333 U.S. 364, 395, 68 S.Ct. 525, 541,92 L.Ed. 746 (1948)." State v. Antwine, 743 S.W.2d at 66. After reviewing the evidence, we are left with the definite and firm conviction, at least as to the three named black potential jurors struck on the basis of their youth and driving records, that a mistake was committed.
We are also left with such a definite and firm conviction regarding juror Mr. Joseph Williams, struck because of the prosecutor's experience that "in capital cases, teachers are more forgiving and less prone to invoke the death penalty." The State's strike of Mr. Joseph Williams in this case is "illustrative of the types of evidence that can be used to show sham or pretext"; it prompted " '[A]n explanation based on a group bias where the group trait is not shown to apply to the challenged juror specifically.' Slappy, 503 So.2d at 355. For instance, an assumption that teachers as a class are too liberal, without any specific questions having been directed to the panel or the individual juror showing the potentially liberal nature of the challenged juror." Ex parte Branch,526 So.2d at 624.
The voir dire of this jury panel included extensive "death qualification" questioning. When the panel was asked whether any of them had any opposition to the death penalty, Mr. Joseph Williams, unlike at least one other teacher on the panel, did not respond. The prosecutor's assumption that Mr. Williams, because he was a teacher, would be less likely to invoke the death penalty is not borne out by the voir dire, which, indeed, appears to have refuted that assumption. The assumption, then, is "based on a group bias where the group trait is not shown to apply to the challenged juror specifically." Ex parte Branch,id.
Although we hold that the trial court's finding of racial neutrality is clearly erroneous only as to the four named jurors, we have serious doubts about the State's striking juror Grisham because he "smiled at the defendant," and juror McGhee because she "looked away" from the prosecution when introducing herself. "[T]he exercise of peremptory challenges is the product of the subjective analyses of a wide variety of character and personality traits perceived by counsel [and]Batson does not prohibit 'hunch' challenges so long as racial animus is not the motive," State v. Antwine, 743 S.W.2d at 67. However, when the reasons for the State's other strikes, also racially neutral on their face, have been shown to be a sham or a pretext for elimination of jurors on racial grounds, then all
the strikes become somewhat more suspect than they might otherwise have been. See State v. Antwine, 743 S.W.2d at 65;Slappy v. State, 503 So.2d 350 (Fla.Dist.Ct.App. 1987), affirmed, 522 So.2d 18 (1988), cert. denied, Florida v. Slappy, *Page 595 
___ U.S. ___, 108 S.Ct. 2873, 101 L.Ed.2d 909 (1988).
The State exercised its peremptory challenges in violation ofBatson v. Kentucky and Ex parte Branch, and Powell is entitled to a new trial. Because the validity of his arrest is likely to be an issue upon a retrial, we now consider that question.
 II
Powell argues that he was illegally arrested, and, therefore, that evidence of his flight should not have been submitted to the jury, and that his confession and clothes should not have been admitted into evidence.
In denying Powell's motion to suppress, the trial judge entered the following pretrial "memorandum opinion":
 "Timothy Powell (Powell) was indicted for the offense of Capital Murder of Esther Herchenroeder. He has filed a motion to suppress his confession and seizure of his clothing.
 "Ms. Herchenroeder was found dead in her residence on June 3, 1986. During the course of the investigation Lewis Smith was questioned. Smith told the officers that on May 29, 1986, he had a conversation with Powell in the yard of Herchenroeder's home. Powell told him that he had broken into Ms. Herchenroeder's home, and also told him that the 'old lady' had a lot of money in her house; and he asked Smith if Smith wanted to help him knock the old lady over. The officers did not attempt to secure a warrant for Powell's arrest for the murder of Ms. Herchenroeder; instead, based on this information, a be on the lookout bulletin (BOLO) for Powell was issued. The BOLO said that Powell was 'wanted for questioning in the murder of Esther Herchenroeder. . . .'
 "On Thursday, June 5, 1986, at approximately 7:10 a.m., Corporal Webb was on routine patrol about four or five blocks from Powell's home. He saw a black male walking in a westwardly direction on Delano Avenue. The black male saw Webb's cruiser and abruptly turned and walked toward a house. Webb did not stop immediately, instead he parked his cruiser around a corner out of sight of the subject. About five minutes later he saw the subject walking in the same direction, and upon comparing the subject with the picture on the BOLO he concluded that the subject was Powell. Webb stopped Powell and asked him his name. Powell gave Webb a false name and Webb immediately attempted to place Powell under arrest for concealing identity.[1] Powell broke away from Webb and ran. He was apprehended a short time later. Webb then charged Powell with resisting arrest.
 "Powell was transported to police headquarters, placed in an office in the Detective Division, told he would be questioned about a charge of capital murder and given his Miranda rights at 7:40 a.m. Miranda v. Arizona, 386 [384] U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694] (1966). Sometime later in the morning Sergeant Marshall received information that Powell's fingerprint had been identified on a coffee pot in Ms. Herchenroeder's house. Upon receiving this information, Sergeant Marshall immediately made a warrantless arrest of Powell for the capital murder of Ms. Herchenroeder. This occurred between 8:15 and 8:45 a.m. Marshall took steps to secure an arrest warrant for Powell and an arrest warrant was issued at 11:00 a.m.
 "Powell remained handcuffed to a chair in the detective division from 7:30 a.m. to 3:00 p.m., except for thirty-eight minutes when he was giving video-taped statements. Powell was not given any food, drink or cigarettes. At some point, Powell was required to disrobe and all of his clothing was seized.
 "Powell was Mirandized at 10:15 a.m., and questioned. He was Mirandized again at 11:20 a.m., and he gave a videotaped statement in which he said he witnessed Lewis Smith kill Ms. Herchenroeder. Powell was Mirandized and gave another video-taped statement at 2:20 p.m., in which he said it was Robert Goldsmith, not Lewis Smith, who killed Ms. Herchenroeder. He was placed in *Page 596 
the City Jail at 3:00 p.m. While Powell was in the City Jail he was given the opportunity to eat, and the court can reasonably conclude that Powell did eat.
 "At 5:50 p.m., Marshall took Powell from the jail to the Investigative Division. The events which transpired from that time until approximately 8:00 p.m., are sketchy, but it appears he was questioned further and allowed to confront Goldsmith.
 "Powell is an ex-felon, and he had been on the Supervised Intensive Restitution Program (SIR). Harvey Searcy is a law enforcement officer and a Department of Corrections employee who was assigned to the SIR Program in Montgomery County. Searcy had known Powell when Powell was incarcerated, and Searcy either supervised or became reacquainted with Powell while Powell was on the SIR program. Searcy either heard on the radio or saw on T.V. that Powell had been arrested, and at about 7:45 p.m. he called the detective division to offer his assistance because Powell 'would trust him as much as anyone in law enforcement.' At 8:00 p.m., Searcy had a private five minute conversation with Powell, and Powell told Searcy that he was scared and did not want to spend the rest of his life in prison; and he also told Searcy that neither Smith nor Goldsmith killed Ms. Herchenroeder. Apparently, Powell was about to confess when Searcy stopped the conversation.
 "After a ten minute break Searcy and Investigator Bob Davis talked with Powell at which time Powell told them that he killed Ms. Herchenroeder. Davis called Marshall in and it is unclear if Powell was Mirandized before or after he gave this confession. The rights form and waiver was executed at 9:00 p.m., and the jail records reflect that Powell was returned to the jail at 9:00 p.m. It can reasonably be inferred that he was given the Miranda rights after his confession.
 "On June 6, 1986, Powell was required to provide items for a rape kit, and on June 7, 1986, a blood sample was taken. The court does not know if the blood sample was taken pursuant to judicial order.
 "The State contends that (1) Sergeant Webb had probable cause to arrest Powell for a violation of [Montgomery Municipal] Code § 29-15(a)(6), (2) that § 29-15(a)(6), supra, is constitutional, (3) that if § 29-15(a)(6) is unconstitutional, Sergeant Webb acted in good faith on a facially valid ordinance, (4) that probable cause existed to arrest Powell for Ms. Herchenroeder's murder at the time he was arrested by Sergeant Webb for concealing identity; and (5) that probable cause existed for Marshall to arrest Powell; and (6) that if Powell's arrest was illegal, there were sufficient intervening events between his arrest and confession to attenuate the taint of the illegal arrest.
 "Powell contends that his confession, the seizure of his clothing, the seizure of items for the rape kit and the blood sample are the fruit of an illegal arrest and must be suppressed. He contends his arrest was illegal because (1) Sergeant Webb did not have probable cause to arrest him for concealing identity, (2) § 29-15(a)(6) is unconstitutional; and (3) probable cause did not exist to arrest him for Ms. Herchenroeder's murder at the time he was arrested for concealing identity or at any later time. He further contends that the events which intervened between his arrest and the seizures and his confession did not attenuate the taint of the illegal arrest.
 "Police officers may arrest an individual without a warrant if a felony has been committed and they have reasonable cause (probable cause) to believe that the person arrested committed this felony. Ala. Code § 15-10-3(3). A police officer has probable cause to arrest when he has knowledge of circumstances such as would lead a reasonable man of ordinary caution, acting impartially, reasonably and without prejudice, to believe the person arrested is guilty. Swicegood vs. State, 448 So.2d 433, 434 (Ala.Crim.App. 1984). In determining whether Marshall or any other officer had probable cause *Page 597 
to arrest Powell, the court must deal with probabilities which are not technical, but factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians would act. United States v. Seay, 432 F.2d 395 (5th Cir. 1970). Probable cause does not mean a sufficient quantum of evidence to support a conviction. McCants vs. State, 459 So.2d 992, 994
(Ala.Crim.App. 1984). A BOLO bulletin does not in and of itself constitute probable cause for an arrest. D'Agostino vs. State, 310 So.2d 12 (Fla. 1975). Police officers must have probable cause to take a person into custody and transport that person, without his consent, to the police station and detain him for interrogation. Dunaway v. New York, 442 U.S. 200 [99 S.Ct. 2248, 60 L.Ed.2d 824] (1979).
 "Although Powell raises the issue of the constitutionality of § 29-15(a)(6), it is unnecessary to resolve this issue because the court finds that Webb had no cause, probable or otherwise, to arrest Powell for violation of this section.[2] Powell was not loitering or wandering upon the streets or from place to place without apparent reason or business. He was walking in his neighborhood in the early daylight hours, and apparently, in the direction of his home. The fact that he attempted to avoid Webb is due slight weight. Swicegood vs. State, supra. It must have reasonably appeared to Webb that Powell was loitering or wandering on the street without apparent reason or business before Webb would have been justified in stopping Powell and demanding identification. It is clear that at the time Webb stopped Powell, Webb knew Powell's identity, and, in fact, only stopped Powell because of the BOLO. Finally, because Webb's attempted arrest was illegal, Powell had the right to resist the arrest by running from Webb.
 "An individual reasonably suspected of engaging in criminal activity at the time he is stopped, may be detained on the side of the road for a period of 20 minutes, when the detention is necessary for a law enforcement officer to conduct a limited investigation of the suspected criminal activity. United States vs. Sharpe, 470 U.S. 675, 105 S.Ct. 1568 [84 L.Ed.2d 605] (1985). However, the seizure of an individual from a city street and his transportation to police headquarters where he is secured to a chair in the investigative division for interrogation is an entirely different matter. Labeling these more serious detentions as 'investigative' is not a panacea. See, Hayes vs. Florida, 470 U.S. [811], 105 S.Ct. 1643
[84 L.Ed.2d 705] (1985) (a suspect cannot be taken from his home and transported to the station house for fingerprinting, without his consent and without probable cause or prior judicial authorization). See, Davis vs. Mississippi, 394 U.S. 721
[89 S.Ct. 1394, 22 L.Ed.2d 676] (1969); Dunaway vs. New York, supra. Cf., Taylor vs. Alabama, 457 U.S. 687
[102 S.Ct. 2664, 73 L.Ed.2d 314] (1982). Moreover, under the facts of this case the court finds that this was not simply a stop to identify Powell, question him, and detain him briefly in order to obtain additional information. United States vs. Hensley, 470 [469] U.S. [221], 105 S.Ct. 675
[83 L.Ed.2d 604] (1985).
 "Powell may have been the chief suspect in Mrs. Herchenroeder's murder at the time he was arrested by Webb; however, the police officers did not have probable cause for his arrest. The information from Lewis Smith was of little value because (1) there was no indication that Smith was in any manner reliable; and (2) the information had not been corroborated by any other matters within the officers knowledge or corroborated by independent investigation. Although a determination of whether there is probable cause to arrest is now analyzed according to the totality of the circumstances test as announced in Illinois v. Gates, 462 U.S. 213 [103 S.Ct. 2317, 76 L.Ed.2d 527] (1983), it is still important to establish the reliability of the informant, or corroborate the informant's tip by independent investigation. State vs. Butler, 461 So.2d 922 (Ala.Crim.App. 1984). It was not until Officer Marshall learned *Page 598 
that a latent print found on the coffee pot in Ms. Herchenroeder's house matched Powell's known prints, that the police had probable cause to arrest Powell.[3]
 "The court holds that at the time Officer Marshall arrested Powell he had probable cause to make the arrest. Marshall's knowledge that Powell's print was found in Mrs. Herchenroeder's home in and of itself was sufficient probable cause to make the arrest. People v. Coaxum, [126 Misc.2d 122] 481 N.Y.S.2d 286 (N.Y. Sup. Ct. 1984); People v. Anderson, 149 Cal.App.3d 1161, 197 Cal.Rptr. 333 [413] (Cal.Ct.App. 1969 [1983]).[4] The fact that Powell was at police headquarters, albeit illegally, at the time Marshall made the arrest merely made it more convenient for Marshall to make the arrest, which he would have inevitably made. Because Powell's arrest by Marshall was legal, neither the seizure of his clothing nor his confession is tainted by Webb's illegal arrest.
 "The court does hold that the statement made by Powell to Marshall to the effect that he knew the old lady — he had never been in her house — but didn't kill her, must be suppressed because it was the fruit of the initial illegal arrest by Webb."
Prior to trial, this opinion was "extended" as follows:
 "The court extends its memorandum opinion of March 18, 1987, to include a recent development in the law concerning one of the issues in this case.
 "On March 18, 1987, the court signed its Memorandum Opinion and Order in this case, and among the issues presented was the constitutionality of Montgomery, Ala., Code § 29-15(a)(6) (1980). The court declined to rule on the constitutionality of this section; however, in Footnote 2 of its Opinion, the court expressed its grave concern regarding the constitutionality of that section.
 "Unbeknown to this court, on March 17, 1987, Honorable Myron Thompson ruled that § 29-15(a)(6) was unconstitutionally vague and violated U.S. Const. amend. XIV, § 1 (the due process clause), and was unconstitutional in its application in violation of U.S. Const. amend. IV. Timmons vs. City of Montgomery [658 F. Supp. 1086] CV-86-T-709-N (D.Ala. March 17, 1987). Because (1) the decision in Timmons does not effect the factual conclusions in this court's Opinion; and (2) the court is not bound by the ruling of the federal district court on the federal constitutional question, Black vs. Wilson, 281 Ala. 6, 198 So.2d 286 (Ala. 1967), the Court's Opinion and order remains unchanged. The Opinion is extended merely to note this recent development in the law."
During the trial, Powell renewed his motion to suppress, which the trial judge denied with the following comments:
 "Without prolonging it, it will be the court's ruling that the ruling that it previously made stands. I find that there was additional evidence in this case upon which Mr. Powell could have been held at the time that he was: Primarily, the Fugitive Warrant for Parole Violation.
 "And this Court's mind is somewhat akin to the situation which arose in United States vs. Hensley
at 105 Sup.Ct. 675.
 "I also find that there may have been sufficient probable cause and there probably was probable cause to hold him perhaps even on the charge that he was held on at the time, and that his fingerprinting was not unreasonable under the circumstances. And accordingly, the renewed motion to suppress will be denied." (R. 751-52.) *Page 599 
With regard to the probable cause issue, the trial judge also made the following comments during the course of the trial.
 "I am also going to instruct the jury that in the event that his arrest, attempted arrest under this [ordinance], though — you know, the fact of the matter is Mr. Webb didn't have probable cause to arrest him under the Statute. I am concerned about the fact that it was unconstitutional. Webb just didn't have cause to arrest him to start with. There is nothing wrong with Webb walking up and talking to him and asking him his name. We know that. That's just a reasonable field attention [sic]. At some point it got — it went wrong. And, you know, I think it's just going to be a jury call whether Mr. Powell fleeing [sic] because he thought he was being arrested unlawfully or Mr. Powell fleeing [sic] because it was consciousness of guilt in this case. And that's what I am going to tell the jury. (R. 823-24.)
". . .
 "In my ruling yesterday — and I should have made it very plain to you. But as of five after eight, I found that there was probable cause to detain Mr. Powell. And according to my recollection from a previous hearing, that statement by Mr. Powell to Sergeant Marshall was made at a time later than that. And for that reason, I overruled your objection to it." (R. 965.)
In instructing the jury on the issue of flight, the trial judge stated:
 "It's up to you, number one, to determine whether or not Mr. Powell's actions constituted flight in this case. I say that for this reason. I previously made a judgment in this case and a ruling on the law that Corporal Webb did not have probable cause to arrest Mr. Powell for concealing identity. There is more to the Statute than just concealing identity. And I determined that Corporal Webb did not have probable cause to arrest him for what he arrested him for in this case."
The facts adduced, both at the pretrial hearing on the motion to suppress and during the course of the trial itself, reveal the following series of events:
On Tuesday, June 3, 1986, Mrs. Herchenroeder's body was discovered in her home. She had been brutally beaten and the house had been ransacked. The condition of the body indicated that the murder probably occurred on Saturday morning, May 31, 1986.
Lewis Smith was in jail on a warrant for probation violation. Officers of the Montgomery Police Department questioned him shortly after midnight on June 4th about the murder. He told the police that he had been a yard man for Mrs. Herchenroeder. On Thursday, two days before the murder, Smith said, he had a conversation with an individual known to him as Tim Flowers, who was also doing some work for Mrs. Herchenroeder. According to Smith, Flowers told Smith that he had recently burglarized Mrs. Herchenroeder's house but had only taken some canned goods and told Smith that "the old lady had a lot of money" and asked Smith "if he wanted to help him knock her off."
On the afternoon of June 4, 1986, Smith was "wired" and sent to find Flowers in an effort to get incriminating evidence against Powell. However, the person known to him as Flowers refused to talk about Mrs. Herchenroeder. During the conversation, Smith did learn that Flowers's real name was Powell, this appellant, and where he was living. At that time, police officers converged on the scene, but Powell ran away and disappeared. Soon after this, a BOLO (be on the lookout) was issued for Powell.
At 7:10 on the morning of June 5, 1986, Montgomery Police Officer Lester Webb was on patrol when he spotted Powell on Delano Avenue in Montgomery. Powell was walking ahead of the patrol car. Officer Webb testified that when Powell turned and looked at the patrol car, "He immediately turned up to a house. It appeared to me, at random." Webb, pretending not to have seen Powell, drove past Powell and waited down the street. In approximately five minutes, Powell came walking along. Webb got out of his patrol car and asked *Page 600 
Powell his name and address. Powell told Officer Webb his name was Anderson and that he lived at 374 Azalea.
Webb told Powell that his name was Powell and that he was under arrest for concealing his identity. When Officer Webb attempted to handcuff Powell, Powell broke free and ran. Officer Webb chased Powell, who was shortly apprehended by other officers responding to Webb's radio instructions. Powell was taken into custody and arrested for concealing identity and resisting arrest. Officer Webb testified that his "initial reason for stopping" Powell was the BOLO, "[t]he Investigative Division wanted to question him."
Powell was transported to police headquarters, told he would be questioned about the capital murder, and advised of his constitutional rights at 7:40 a.m. Sometime between 8:15 and 8:45 that same morning, he was advised that he was under arrest for the capital murder of Mrs. Herchenroeder.
We hold that Powell's initial arrest by Corporal Lester Webb was based on probable cause to believe he committed the capital murder of Mrs. Herchenroeder. Powell's flight from Corporal Webb, his confession, and the evidence derived from the seizure of his clothes were not the fruits of an illegal arrest, and they were admissible.
The fact that Officer Webb placed Powell under arrest for concealing identity pursuant to Montgomery City Code § 29-15(a)(6) (1980), that he had no probable cause for an arrest under that provision, and that the provision was later declared unconstitutional,[1] are all immaterial here. The arrest does not depend for its validity upon the subjective reliance of the arresting officer or upon the constitutionality of the municipal ordinance. "When an officer makes an arrest, which is properly supported by probable cause to arrest for a certain offense, neither his subjective reliance on an offense for which no probable cause exists nor his verbal announcement of the wrong offense vitiates the arrest." United States v.Saunders, 476 F.2d 5, 7 (5th Cir. 1973). See generally 2 W. LaFave, Search and Seizure § 5.1(e) at 416 n. 168 (2d ed. 1987).
 "[T]he fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action." Scott v. United States, 436 U.S. 128, 136, 138, 98 S.Ct. 1717, 1723, 56 L.Ed.2d 168 (1978).
In Reese v. State, 145 Ga. App. 453, 243 S.E.2d 650 (1978), the officer had probable cause to arrest the accused for rape, but stated that the charge was "prowling." The court observed:
 "The fact that the appellant was not initially charged with rape but with another, apparently baseless, charge does not invalidate the arrest. It is clear from the record that the actual reason he was taken into custody was because he was believed to be the rapist and that this belief was a reasonable one under the circumstances. . . . [H]ere the arresting officer suspected the appellant of the crime for which he was ultimately charged from the first moment he saw him. It is obvious that the initial charge of 'prowling' was made merely as a pretext *Page 601 
text for taking him into custody until a positive identification could be made by a specific victim. Since we have ruled that no such pretext was necessary, the mere fact that it was used does not require a reversal of the convictions." 243 S.E.2d at 652.
In the present case, the information provided to the police by Lewis Smith established probable cause to believe that Powell had committed the burglary/murder and robbery/murder of Mrs. Herchenroeder. Smith reported the following facts: He had done yard work for Mrs. Herchenroeder prior to her death. At one time he had been in the city jail for a month and, when he was released, he went back to work for Mrs. Herchenroeder. She told him that during the time he had been in jail her house "had been broken into." She stated that she did not report the burglary because only canned goods were taken. Then, on Thursday, May 29, two days before Mrs. Herchenroeder's death, Lewis Smith had a conversation about the burglary with Powell, also a yard man for the victim, in Mrs. Herchenroeder's yard. Powell told Smith that he (Powell) was the one who had burglarized Mrs. Herchenroeder's house but "all he got was canned goods." Powell told Smith that "the old lady had a lot of money" and asked Smith if he "wanted to help [Powell] knock her off."
The standard for determining whether an informant's tip supplies probable cause for an arrest is the totality-of-the-circumstances test adopted in Illinois v.Gates, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). "Although the two-pronged test of Aguilar-Spinelli has been abandoned, it has not been forgotten." Bishop v. State,518 So.2d 829, 831 (Ala.Cr.App. 1987).
 " '[A]n informant's "veracity," "reliability," and "basis of knowledge" are all highly relevant in determining the value of his report' and are 'relevant considerations in the totality-of-the-circumstances analysis that traditionally has guided probable cause determinations: a deficiency in one may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability.' Gates, 462 U.S. at 230, 233, 103 S.Ct. at 2328-29." Bishop v. State, 518 So.2d at 831.
Aguilar's veracity prong may be satisfied by showing either that the informant is "credible" or that his information is "reliable." Aguilar v. Texas, 378 U.S. 108, 114, 84 S.Ct. 1509,1514, 12 L.Ed.2d 723 (1964). "The 'veracity' prong, in precise terms, has two disjunctive spurs, seeking either (a) the inherent 'credibility' of the person himself or (b) some other circumstances reasonably assuring the 'reliability' of the information on the particular occasion of its being furnished." Moylan, "Hearsay and Probable Cause: An Aguilar and SpinelliPrimer," 25 Mercer L.Rev. 741, 755 (1974) (emphasis in original). Here, both spurs of the veracity prong were satisfied.
An informant, to be considered credible, "need not be a disinterested public-spirited citizen. The courts have long recognized that many police informants are not pillars of the community and may co-operate with the police only to curry favor with the authorities at a time when their own right to continued liberty is in peril." People v. Rodriguez, 52 N.Y.2d 483, 438 N.Y.S.2d 754, 757, 420 N.E.2d 946, 949 (1981). Here, Smith was in custody on a probation violation warrant and was, himself, a suspect in the murder at the time he gave the police information implicating Powell. However, "the criminal record of an informant or the current predicament in which he finds himself within the criminal justice system does not necessarily render him unreliable." Rodriguez, 438 N.Y.S.2d at 757,420 N.E.2d at 949.
 "Neither, however, can we blithely accept as true the accusations of an informant unless some good reason for doing so has been established. Otherwise the liberty of each of us is at too great a risk. Thus, before the police can act upon the informant's tale, they must be prepared to demonstrate that they had good reason to believe that this particular informant was telling the truth." Id. *Page 602 
In most cases, the police demonstrate that they have good reason to believe their informants by referring to the tipsters' past performance for providing accurate information. See generally W. LaFave, 1 Search and Seizure § 3.3(b) at 627 (2d ed. 1987). Although there was no showing that Smith had ever given the police any prior information which proved to be correct, "[a]n informant need not have a 'track record' before his veracity can be established." Pugh v. State, 493 So.2d 388,391 (Ala.Cr.App. 1985), affirmed, Ex parte Pugh, 493 So.2d 393
(Ala. 1986) (quoting W. LaFave, I Search and Seizure 510, 522 (1978)). Here the police had at least three good reasons to believe Smith even though he had no "track record."
First, Smith was in custody and had every reason to think he would be dealt with unfavorably if it were later discovered that he gave false information regarding an important murder investigation. Compare People v. Rodriguez, supra, where the court made the following observation:
 "Defendant makes much of the fact that Garcia was in custody at the time of his statement, noting that he may have been willing to offer any statement, even a false one, to better his own position. However, as we have noted, Garcia's predicament is not necessarily an indicator of his unreliability. In fact, it may well have been a strong motivation for Garcia to tell the truth. In custody on serious charges, Garcia made his statement to assist his captors in uncovering the crime of another. He knew that the police would act upon it. He must also have known that sending the police on a fruitless errand would avail him of little, for this sport, too, could as easily become part of his record. Hence, he had every reason to tell all and tell it truthfully." Id. at 950. See also Pugh v. State, 493 So.2d at 392.
Second, although Smith could have implicated Powell merely to divert attention away from himself as the murder suspect, the record reveals no reason for Smith to falsely accuse Powell on this basis since Smith had "a solid alibi" for the crime. Third, Smith allowed himself to be "wired" during an encounter with Powell in an attempt to obtain an incriminating statement from Powell about the murder. Smith's "wired" confrontation with Powell bolstered his credibility in the sense that it proved he knew Powell, could have been in a position to gain from Powell the information he claimed to have acquired, and was not merely passing on "an offhand remark heard at a neighborhood bar." Spinelli v. United States, 393 U.S. 410,417, 89 S.Ct. 584, 589, 21 L.Ed.2d 637 (1969). Smith's cooperation in being "wired" by the police did not "totally eliminate the possibility of falsehood, but the risk [was] minimized by the fact that it [was] at least known that the informant could have [had] personal knowledge of what he allege[d]." W. LaFave, 1 Search and Seizure § 3.3(f) at 687.
More importantly, if Smith had been lying about what he heard from Powell, he would have been risking exposure of his falsehood by engaging Powell in a police-monitored conversation about the murder. If he were lying about Powell, Smith would have been taking the chance that the police would overhear Powell react to the mention of Mrs. Herchenroeder's murder in any number of ways alerting them to Smith's untrustworthiness. Powell could have flatly denied any part in the crime, become angered at the suggestion he was involved, and mentioned a source of enmity between himself and Smith, thus, giving the police listening to the conversation a reason to discount Smith's story as nothing more than an act of revenge against Powell. If Smith himself had a part in the crime, then he was, by being "wired," risking the possibility that the police would hear Powell point the finger of blame at him. In sum, if Smith were lying, he had a good deal to lose by allowing the police to hear his conversation with Powell. If indeed he was telling the truth, the most he had to lose was what, in fact, happened: Powell simply made no incriminating statements and brushed the inquiry aside. Thus, given all the circumstances of Smith's providing the information about Powell, the police were warranted in finding him worthy of belief. *Page 603 
The "reliability spur" of the Aguilar veracity prong, although clearly satisfied here, is almost beside the point. If
Smith were credible, then his information was reliable because, though it was hearsay, it came from the defendant himself as an admission. See Spinelli v. United States, 393 U.S. at 425, 89 S.Ct. at 593 (White, J., concurring) ("[I]f, for example, the informer's hearsay comes from one of the actors in the crime in the nature of admission against interest, . . . this information should be held sufficient.").
The "basis of knowledge" prong is fulfilled by Smith's claim to have received his information from the defendant himself. Unlike the informant in Taylor v. Alabama, 457 U.S. 687,102 S.Ct. 2664, 73 L.Ed.2d 314 (1982), who was also a suspect in the same crime at the time he gave the Montgomery police a tip implicating Taylor, Lewis Smith disclosed that the basis of his knowledge was a conversation with the defendant. See Spinelliv. United States, supra; Pugh v. State, 493 So.2d at 390
("[T]he basis of his informant's knowledge was the informant's conversation with the defendant.").
We conclude that Smith's tip passes theAguilar-Spinelli test. In essence, this means that the police had a basis for believing that Powell had once burglarized the victim's home but only got canned goods, that two days before the victim's murder, Powell told an acquaintance the victim had "a lot of money," and that Powell invited the acquaintance to help him "knock off" the victim. Quite obviously, these "primary facts" do not prove the "ultimate fact," that the defendant did, two days later, commit the capital murder of Mrs. Herchenroeder during the course of committing a robbery or a burglary. See Brinegar v. United States, 338 U.S. 160,69 S.Ct. 1302, 93 L.Ed. 1879 (1949). However, these primary facts do provide circumstantial evidence or a probability of guilt regarding the ultimate fact. See, e.g., Lundy v. State,539 So.2d 324 (Ala.Cr.App. 1988) (wherein this court held that the defendant's approaching two individuals, within six months of his wife's death, with an offer to kill his wife, provided some circumstantial evidence of his guilt of murder).
"In dealing with probable cause, . . . as the very name implies, we deal with probabilities. . . . 'The substance of all the definitions' of probable cause 'is a reasonable ground for belief of guilt'. . . . And this (means less than evidence which would justify condemnation' or conviction, . . . [but] more than bare suspicion. . . ." Brinegar v. United States,338 U.S. at 175, 69 S.Ct. at 1310 (citations omitted).
In United States ex rel. Townsend v. Twomey, 452 F.2d 350
(7th Cir. 1971), cert. denied, 409 U.S. 854, 93 S.Ct. 190,34 L.Ed.2d 98 (1972), a capital case, the accused argued that there was no probable cause for his arrest. Although the Circuit Court of Appeals held his argument procedurally barred, it stated: "Even if we were to consider this contention as one segment of a totality picture, we find little merit in the claim in view of the findings of fact of the district court. . . . (See Appendix B attached to this opinion)."452 F.2d at 359. Because of its striking similarity to the probable cause issue here, we quote "Appendix B" in full:
"APPENDIX B
 "The memorandum opinion of the district court following the second federal evidentiary hearing reads in part as follows:
 " 'In the month of December 1953 there occurred a series of brutal assaults in the neighborhood of 38th Street and Michigan Boulevard in the City of Chicago. Johnny Stinson, Jack Boone, Thomas Johnson, Willis Thompson, Joseph Martin and Gus Anagnost were assaulted and robbed. Stinson, Boone, Johnson and Thompson all died as a result of an assault, each made with some hard substance. According to Martin and Anagnost, a brick was the object with which they were assaulted. The similarity of these six assaults led police to believe that the assailant was one and the same in each case. The armed robbery of Joseph *Page 604 
Martin took place on December 4, 1953; the assault on Jack Boone occurred on December 18, 1953, and the last assault, on Gus Anagnost, occurred on December 28, 1953. The police undertook a concerted drive to identify and arrest the person or persons guilty of these assaults.
 " 'In the early morning hours of January 1, 1954, a police homicide squad, composed of Police Officers Edward Cagney, John Fitzgerald, George Martin and John Corcoran, arrested several young Negro men on suspicion. Among those arrested were George Hare, Oliver Johnson, Theodore Redd and Vernon Campbell (a/k/a Vincent Campbell). The police accused Vernon Campbell of being implicated in the assaults; but he denied any part. They questioned all the others arrested at length. Campbell and the others informed police that Charles Townsend was a likely suspect, that more than once he had been seen with a brick, and that Townsend had said he was going to use it to "make some money. "The police officers inquired as to when and where they might find him.'
 "Campbell, who was a known associate of Townsend, was driven around in a squad car and the arrest of Townsend followed." 452 F.2d at 364 (emphasis added).
As in the present case, the tipster in Townsend was an acquaintance of the accused, was under suspicion for the same crime when he implicated the accused, and was imparting information gained from a conversation with the accused. Significantly, in the Townsend conversation, the accused revealed his intention to engage in future criminal conduct, just as Powell did when he invited Smith to help him "knock off" the victim. See also State v. Hirsch, 267 Or. 613,518 P.2d 649, 654 (1974) (wherein a friend of the accused told police that accused had been "casing" residential areas and had stated that a particular house "would be easy to loot"). The probable cause equation is stronger here than in Townsend, though, because Powell coupled his revelation of planned future conduct with an admission of similar past criminal conduct. SeeCommonwealth v. Grammo, 8 Mass. App. 447, 395 N.E.2d 476, 480
(1979) (wherein the court held that accused's statements to informant, two weeks prior to arson, "that he set fires, that he was the best torch man in the city, and that he had burned a relative's apartment without detection" were "highly probative"); People v. Goode, 72 Ill. App.3d 798, 28 Ill.Dec. 957, 958, 960, 391 N.E.2d 156, 157, 159 (1979) (wherein the court held that accused's statement to informant that "if he needed money he would stick up an I[llinois] C[entral Railroad] station again," "coupled with knowledge that such a robbery took place was sufficient to generate in the police a reasonable belief that the defendant committed a robbery").
When, in both Townsend and the present case, the police were aware that a crime corresponding to the defendant's earlier stated plan had, in fact, occurred, they could reasonably rely on the probability that the defendant committed the crime. "[T]he facts and circumstances within their knowledge [Mrs. Herchenroeder's robbery/murder] and of which they had reasonably trustworthy information [that Powell invited Smith to help "knock off" the victim because she had "a lot of money"] were sufficient in themselves to warrant a man of reasonable caution in the belief that" Powell committed the offense. Carroll v. United States, 267 U.S. 132, 162,45 S.Ct. 280, 288, 69 L.Ed. 543 (1925) quoted in Brinegar v.United States, 338 U.S. at 175-76, 69 S.Ct. at 1311.
"[P]robable cause is a fluid concept — turning on the assessment of probabilities in particular factual contexts — not readily, or even usefully, reduced to a neat set of legal rules." Illinois v. Gates, 462 U.S. at 232, 103 S.Ct. at 2329. "Because of the kaleidoscopic myriad that goes into the probable cause mix 'seldom does a decision in one case handily dispose of the next.' " United States v. Davis, 458 F.2d 819,821 (D.C. Cir. 1972), quoted in, W. LaFave, 1 Search andSeizure § 3.2 at 556 (2d ed. 1987). Although we find Townsend, supra, and People v. Goode, supra, to be on point, those cases do not "handily dispose" of this *Page 605 
one. The dispositive factor here is simply the reasonableness of the inference, or the probability, that Powell committed the crime which, two days earlier, he had contemplated and invited Smith to join. This inference is one of "the factual and practical considerations of everyday life on which reasonable and prudent men" act. Brinegar v. United States,338 U.S. at 175, 69 S.Ct. at 1310.
We specifically hold that the police had probable cause to arrest Powell based on their knowledge of Mrs. Herchenroeder's murder and the totality of the circumstances surrounding Lewis Smith's tip. However, even if it were determined that only a heightened suspicion and not probable cause arose from this information, Powell's initial arrest by Officer Webb would still have been proper.
Section 15-5-30, Code of Alabama 1975, provides, in pertinent part:
 "A . . . policeman . . . may stop any person abroad in a public place whom he reasonably suspects . . . has committed . . . a felony . . . and may demand of him his name, address and an explanation of his actions."
See Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889
(1968). If the police officer's knowledge of the murder, coupled with Smith's tip, provided grounds for a Terry-type stop pursuant to § 15-5-30, then Powell's giving Webb a false name and address in answer to Webb's legitimate inquiry[2]
provided probable cause for his arrest. "[R]esponses by the suspect which the officer knows to be false . . . may well constitute probable cause when considered together with the prior suspicions." W. LaFave, 2 Search and Seizure § 3.6(f) and 65-66.
Officer Webb knew that Powell's responses were incorrect because he had Powell's photograph, name, and address with him when he made the initial stop. The "obvious falsehood uttered by the defendant in reply to the officer's questions warranted his detention and arrest." People v. Brady, 16 N.Y.2d 186,264 N.Y.S.2d 361, 362, 211 N.E.2d 815, 816 (1965) (accused denied that his name was Brady and that he had been at scene where officer previously observed him). Unlike the refusal to answer questions posed during a Terry stop, see Timmons v. City ofMontgomery, 658 F. Supp. at 1092-93, a "palpably false" answer has "no discernible innocent meaning, and may reasonably be taken to indicate consciousness of guilt." People v. SuperiorCourt of Los Angeles County, 7 Cal.3d 186, 101 Cal.Rptr. 837,845, 496 P.2d 1205, 1213 (1972). See also State v. Valenzuela,121 Ariz. 274, 276, 589 P.2d 1306, 1308 (1979).
Powell's arrest was based on probable cause and was lawful. His subsequent statements, the seizure of his clothing, and the fact of his flight were properly admitted into evidence.
REVERSED AND REMANDED.
All judges concur.
[1] "[Montgomery, Ala., Code § 29-15(a)(6) (1980)].
[2] The Court should avoid ruling on the constitutionality of an ordinance when a ruling is unnecessary; however, the court has a grave concern regarding the constitutionality of § 29-15(a)(6). See, Kolender vs. Lawson, 461 U.S. 352
[103 S.Ct. 1855, 75 L.Ed.2d 903] (1983); Fields vs. City of Omaha, [810] F.2d [830] [No. 86-1293 February 9, 1987] (8th Cir. 1987).
[3] The known prints of Powell were prints on file from Powell's previous arrests.
[4] People vs. Montgomery, [112 Ill.2d 517, 98 Ill.Dec. 353]494 N.E.2d 475 (Ill. 1986), is similar to the case sub judice."
[1] In Timmons v. City of Montgomery, 658 F. Supp. 1086 (M.D.Ala. 1987), § 29-15(a)(6) was declared unconstitutional on two grounds. First, it was determined to be void-for-vagueness in violation of the fourteenth amendment due process clause because its proscription against "loiter[ing] or wander[ing]" was subject to arbitrary enforcement, 658 F. Supp. at 1090. Second, it was found to violate the fourth amendment because even if the police have grounds for the detention of a suspicious individual pursuant to Terry v. Ohio, 392 U.S. 1,88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), a person may not be punished for refusing to identify himself during a Terry stop.658 F. Supp. at 1093. By the second ground for its holding, the District Court in Timmons answered the question left unanswered in the following cases: Terry v. Ohio, 392 U.S. at 34,88 S.Ct. at 1886 (White, J., concurring); Dunaway v. New York,442 U.S. 200, 210 n. 12, 99 S.Ct. 2248, 2255 n. 12, 60 L.Ed.2d 824
(1979); Brown v. Texas, 443 U.S. 47, 53 n. 3, 99 S.Ct. 2637,2641 n. 3, 61 L.Ed.2d 357 (1979); Kolender v. Lawson,461 U.S. 352, 361 n. 10, 103 S.Ct. 1855, 1860 n. 10, 75 L.Ed.2d 903
(1983).
[2] The stop and inquiry were legitimate because Webb had independent grounds under Terry and § 15-5-30 to suspect that Powell had committed a felony, not because Webb perceived a violation of Montgomery Municipal Code § 29-15(a)(6). See Jonesv. Commonwealth, 230 Va. 14, 334 S.E.2d 536 (1985) (wherein the court held that detention and questioning of suspect was justified under Terry notwithstanding officer's reliance on arguably unconstitutional stop-and-identify ordinance).